# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

United States District Court
District of Connecticut
FILED AT BRIDGEPORT
JAN 0 4 2010 20
Roberta D. Tabora, Clerk
By [signature]
Deputy Clerk

JOE BURGOS VEGA
(Plaintiff)

Docket No.
3:09CV737 (VLB)
Date: December 24, 2009
Jury Trial Requested

v.

MARY JODI RELL, (Individual and Official Capacities)
RICHARD BLUMENTHAL, (Individual and Official Capacities)
THERESA LANTZ, (Individual and Official Capacities)
MARY M. MARCIAL, (Individual and Official Capacities)
ANTHONY J. BRUNO, (Individual and Official Capacities)
ABDUL MAJID KARIM HASAN, (Individual and Official Capacities)
WAYNE T. CHOINSKY, (Individual and Official Capacities
MICHAEL BIBBONS, (Individual and Official Capacities)
FREDERICK LEVESQUE, (Individual and Official Capacities)
JOHN SIEMINSKI, (Individual and Official Capacities)
PETER MURPHY, (Individual and Official Capacities)
RICHARD FURREY, (Individual and Official Capacities)
THOMAS THALODY, (Individual and Official Capacities)
RENE KEIDA, (Individual and Official Capacities)
ALFREDO GONZALEZ, (Individual and Official Capacities)
MICHAEL BEAUDRY, (Individual and Official Capacities)

CAPTAIN FREY, (Individual and Official Capacities)
CAPTAIN DONAHUE, (Individual and Official Capacities)
DOCTOR SILVIS, (Individual and Official Capacities)
LIEUTENANT SILVER, (Individual and Official Capacities)
ANDREW JOHNSON, (Individual and Official Capacities)
LIEUTENANT ALLEN, (Individual and Official Capacities)
MAUREEN ALLEN, (Individual and Official Capacities)
CORRECTIONAL OFFICER SANCHEZ, (Individual and Official Capacities)
GARY TROWERS, (Individual and Official Capacities)
CLIFFORD MADISON, (Individual and Official Capacities)
CORRECTIONAL OFFICER ARZT, (Individual and Official Capacities)
CORRECTIONAL OFFICER SHARON, (Individual and Official Capacities)
JAMES DZURENDA, (Individual and Official Capacities)
NEIL CORMIER, (Individual and Official Capacities)

# PLAINTIFF'S FIRST AMENDED COMPLAINT

# I. INTRODUCTION.

1. This is a Civil Rights Action Authorized by 42 U.S.C. § 1983; 42 U.S.C. § 1985; 42 U.S.C. 1986; (Americans with Disabilities Act) 42 U.S.C. § 1201 et seq.; (The Religious Land Use and Institutionalized Persons Act) 42 U.S.C. § 2000 cc- et seq.; to redress violations of Connecticut State Statutes, Federal Statutes and Acts, as well as violations of the United States Constitution by the named defendant(s), their successor(s) in office, their agent(s), cohort(s), employee(s), and all other person(s) in active concert and participation with them irrespective of where the Plaintiff may be housed within the Connecticut Department of Correction.

2. This United States District Court has jurisdiction under 28 U.S.C. § 1343. The Plaintiff seeks declaratory relief, injunctive relief, punitive monetary damages, Compensatory monetary damages, nominal monetary damages, and any further relief the Plaintiff should be entitled.

# II. PLAINTIFF.

3. The Plaintiff, Joe Burgos Vega, a.k.a. Amin Abdul Baqee Khan, is a prisoner under the custody of the Commissioner of the Connecticut Department of Correction.

4. The Plaintiff, Joe Burgos Vega, is a natural born Citizen of the United States of America, a member of an identifiable Class and defined by legislation as Hispanic/Latino.

5. The Plaintiff Joe Burgos Vega is presently Confined at the Garner Correctional Institution 50 Nunnawauk Road, Newtown, Connecticut 06470.

# III. DEFENDANTS.

6. The defendant, Governor M. Jodi Rell, relevant to this Complaint is the Governor of the State of Connecticut. She is under Color of State Law legally responsible for the actions, decisions, management, and all operations of all State of Connecticut Agencies and Departments, including the Connecticut Legislative, Judicial, and Administrative Departments/Branches of Government,

and the Connecticut Department of Correction and all its Correctional Institutions respectively. She is also responsible under Color of State Law to secure the Constitutional Rights (1st Amendment Rights, 5th Amendment Rights, 8th Amendment Rights, 13th Amendment Rights, 14th Amendment Rights, and Rights legislated and afforded to prisoners under the "Religious Land Use And Institutionalized Persons Act", 42 U.S.C. § 2000cc-1, 2, 3, 4, 5, 6, and 7) of the citizens of Connecticut and its wards.

7. The defendant, Richard Blumenthal, relevant to this complaint is the Attorney General for the State of Connecticut. He is under Color of State Law legally responsible for reviewing Connecticut State Agencies' policies and procedures under the Connecticut Administrative Procedure Act, for ensuring that all laws, policies, and actions of Connecticut State Agencies and Officials acting under Color of State Law are legal and Constitutional. The defendant is also responsible for the legal representation of State Agency employees. He is also responsible under Color of State Law to secure the Constitutional Rights (1st Amendment Rights, 5th Amendment Rights, 8th Amendment Rights, 13th Amendment Rights,

14th Amendment Rights, and Rights legislated and afforded to Citizens and Prisoners under the Law, ~~and 42 U.S.C. § 2000 cc-1, 2, 3, 4, 5, 6, and 7)~~ of the Citizens of Connecticut and its wards.

8. The defendant, Theresa Lantz, relevant to this Complaint is the Commissioner for the Connecticut Department of Corrections and was appointed by Former Governor of Connecticut John Rowland. She is legally responsible under Color of State Law for the Supervision, management, and operations of the Connecticut Department of Corrections, all of its Correctional Institutions, and the Department's employees respectively. She is also respinsible under Color of State Law to Secure the Constitutional Rights (1st Amendment Rights, 5th Amendment Rights, 8th Amendment Rights, 13th Amendment Rights, 14th Amendment Rights, and Rights legislated and afforded to prisoners under the "Religious Land Use And Institutionalized Persons Act"; 42 U.S.C. § 2000 cc-1, 2, 3, 4, 5, 6, and 7) of its wards.

9. The defendant, Mary M. Marcial, relevant to this Complaint is deputy Commissioner of Programs for the Connecticut Department of

Corrections. She is legally responsible under Color of State Law for assisting in the management and operations of the Department assigned to her (Department of Programs) by the defendant Theresa Lantz Commissioner of the Connecticut Department of Corrections. Mary M. Marcial must report to her Supervisor Theresa Lantz while assisting in the management and Operations of her office, the Connecticut Department of Corrections and all its Correctional Institutions respectively. She is also responsible under Color of State Law to Secure the Constitutional Rights (1st Amendment Rights, 5th Amendment Rights, 8th Amendment Rights, 13th Amendment Rights, 14th Amendment Rights, and Rights legislated and afforded to prisoners under the "Religious Land Use And Institutionalized Persons Act", 42 U.S.C. § 2000 cc-1, 2, 3, 4, 5, 6, and 7) of its wards.

10. The defendant, Anthony J. Bruno, relevant to this Complaint is the Religious Director of Religious Services for the entire Connecticut Department of Corrections. He supervises, Coordinates, etc., all Religious activities for the Connecticut Department of Correction. He is legally responsible under Color of State Law for all religious activities, items, worship,

celebrations, etc., within the Connecticut Department of Correction. The defendant is legally responsible under Color of State Law to ensure and Secure the Constitutional Rights (1st Amendment Rights, 5th Amendment Rights, 8th Amendment Rights, 13th Amendment Rights, 14th Amendment Rights, and Rights afforded to the Plaintiff by the State of Connecticut General Statutes, Connecticut State Constitution, Rights afforded to the Plaintiff by Federal Law and the Constitution of the United States, and the "Religious Land Use And Institutionalized Persons Act", 42 U.S.C. § 2000cc-1, 2, 3, 4, 5, 6, and 7) of its wards.

11. The defendant, Abdul Majid Karim Hasan, relevant to this complaint is the contracted consultant on Islamic matters to the defendants, Commissioner, Deputy Commissioners, Religious Director(s), Supervisors, etc., all employees of the Connecticut Department of Corrections. He is legally responsible under Color of State Law for advising and formulating rules and regulations governing Islamic Functions - what defendants allow and what they prohibit - therefore, formulating Connecticut Department of Correction Administrative Directive Regulation(s). He further reviews and is active processing contracts for the Connecticut Department of Corrections. Abdul Majid Karim Hasan is legally responsible under Color of State Law for the management and operations of

Islamic Religious affairs/functions and/or regulations within the Connecticut Department of Corrections and all Correctional Institutions respectively. He is also legally responsible under Color of State Law to secure the Constitutional Rights (1st Amendment Rights 5th Amendment Rights, 8th Amendment Rights, 13th Amendment Rights, 14th Amendment Rights, and Rights afforded to prisoners under the "Religious Land Use and Institutionalized Persons Act", 42 U.S.C. § 2000cc-1, 2, 3, 4, 5, 6, and 7) of its wards.

12. The defendant, Wayne Choinsky, relevant to this complaint is District Administrator for the Northern District of the Connecticut Department of Correction. He is legally responsible under Color of State Law for making Line Grievance decisions affecting the Plaintiff's known secured Constitutional Rights (1st Amendment Rights, 5th Amendment Rights, 8th Amendment Rights, 13th Amendment Rights, 14th Amendment Rights, and Rights afforded to prisoners under the "Religious Land Use And Institutionalized Persons Act", 42 U.S.C. § 2000cc-1, 2, 3, 4, 5, 6, and 7) of its wards.

13. The defendant, Michael Bibbons, relevant to this complaint is legally responsible under Color of State Law to secure the Constitutional

Rights (1st Amendment Rights, 5th Amendment Rights, 8th Amendment Rights, 13th Amendment Rights, 14th ~~Amendment Rights, and Rights afforded to prisoners~~ under the "Religious Land Use And Institutionalized Persons Act", 42 U.S.C. § 2000cc-1, 2, 3, 4, 5, 6, and 7) of its wards.

14. The defendant, Frederick Levesque, relevant to this Complaint is legally responsible under Color of State Law for the Central Classification and population Management, and transfers of all inmates/Prisoners in the Connecticut Department of Correction and further duties described within the scope of his job description. The defendant, Frederick Levesque, is the Director of the Classification and Population Management Office of the Department of Correction in the State of Connecticut at the Walker Reception Center and Population Management Office and is legally responsible Under Color of State Law to secure the Constitutional Rights (1st Amendment Rights, 5th Amendment Rights, 8th Amendment Rights, 13th Amendment Rights, 14th Amendment Rights, Rights afforded to prisoners under the Connecticut General Statutes, the Connecticut State Constitution, the United States Constitution, and Federal and State Acts) of its wards.

15. The defendant, John Sieminski, relevant to this Complaint was the Warden at the MacDougall-Walker Correctional Institution. He is legally responsible under Color of State Law for his actions, decisions, etc., during his management and supervision of the Facility's Administrative Departments, Policies, and Decisions affecting the Plaintiff's known secured Constitutional Rights (1st Amendment Rights, 5th Amendment Rights, 8th Amendment Rights, 13th Amendment Rights, 14th Amendment Rights, and Rights afforded to prisoners under the "Religious Land Use And Institutionalized Persons Act", 42 U.S.C. § 2000cc-1, 2, 3, 4, 5, 6, and 7) of its wards.

16. The defendant, Peter Murphy, relevant to this complaint is the Warden at MacDougall-Walker Correctional Institution. He is legally responsible under Color of State Law for the management and supervision of all Facility's Administrative Departments, for policies and decisions affecting the Plaintiff's known Secured Constitutional Rights (1st Amendment Rights, 5th Amendment Rights, 8th Amendment Rights, 13th Amendment Rights, 14th Amendment Rights, and Rights afforded to prisoners

under the "Religious Land Use And Institutionalized Persons Act", 42 U.S.C. § 2000 cc-1, 2, 3, 4, 5, ~~6, and 7) and of all its wards.~~

17. The defendant, Richard Furrey, relevant to this Complaint is MacDougall-Walker Correctional Institution's Medical Department's head Supervisor. He is legally responsible under Color of State Law for the supervision, management, operation, decisions, and treatment given and/or denied at the MacDougall-Walker Correctional Institution's Medical Department. He is further responsible under Color of State Law for reviewing, investigating, and making decisions pertaining to all Medical Line Grievances and Emergency Line Grievances, decisions on doctor's prescriptions and recommendations, and for Securing the Constitutional Rights (1st Amendment Rights, 5th Amendment Rights, 8th Amendment Rights, 13th Amendment Rights, 14th Amendment Rights, and all Rights afforded to prisoners) of its wards.

18. The defendant, Thomas Thalody, relevant to this Complaint is the dentist at MacDougall-Walker Correctional Institution who caused the Plaintiff's jaw to lock, excruciating pain, damaged the Plaintiff's tooth, and denied the

the Plaintiff treatment and pain medication for a substancial amount of time. The defendant is legally responsible under color of State Law for the dental work he performed on the Plaintiff (and other inmates). The defendant is legally responsible under Color of State Law to ensure and Secure the Constitutional Rights (1st Amendment Rights, 5th Amendment Rights, 8th Amendment Rights, 13th Amendment Rights, 14th Amendment Rights and Rights afforded to the Plaintiff by the State of Connecticut General Statutes and its Constitution, Rights afforded to the Plaintiff by Federal Law and the Constitution of the United States) of its wards.

19. The defendant, Rene Keida, relevant to this Complaint is MacDougall-Walker Correctional Institution's Religious Coordinator and Supervisor. He is legally responsible under Color of State Law for managing and Supervising all Facility's Religious functions, scheduling time slots for all religions namely all Islamic activities, and for Securing Known Constitutional Rights (1st Amendment Rights, 5th Amendment Rights, 8th Amendment Rights, 13th Amendment Rights, 14th Amendment Rights, and all Rights afforded to Prisoners under the "Religious Land Use

And Institutionalized Persons Act", 42 U.S.C. § 2000 cc-1, 2, 3, 4, 5, 6, and 7) of its wards.

20. The defendant, Alfredo Gonzalez, relevant to this Complaint was MacDougall-Walker Correctional Institution's J-unit Manager. He is legally responsible under Color of State Law for supervising, managing, and making decisions within the scope of his job and responsibilities as Captain and Unit Manager. He is further legally responsible under Color of State Law to secure the Constitutional Rights (1st Amendment Rights, 5th Amendment Rights, 8th Amendment Rights, 13th Amendment Rights, 14th Amendment Rights, and Rights afforded to prisoners under the "Religious Land Use And Institutionalized Persons Act", 42 U.S.C. § 2000 cc-1, 2, 3, 4, 5, 6, and 7) of its wards.

21. The defendant, Michael Beaudry, relevant to this Complain is Captain of the Security division at the MacDougall-Walker Correctional Institution. He is legally responsible under Color of State Law for all Security related matters, assessing information and determining its reliability, and for reporting up to his

Superiors such as Majors, Deputy Wardens, Wardens, Religious Coordinators and supervisors, Deputy Commissioner(s), and the Commissioner. He is further legally responsible under color of State Law for securing the Constitutional Rights (1st Amendment Rights, 5th Amendment Rights, 8th Amendment Rights, 13th Amendment Rights, 14th Amendment Rights, and Rights afforded to prisoners under the "Religious Land Use And Institutionalized Persons Act", 42 U.S.C. § 2000 cc-1, 2, 3, 4, 5, 6, and 7) of its wards.

22. The defendant, Captain Frey, relevant to this complaint is legally responsible under Color of State Law for supervising and managing the functions and activities of Q-pod/unit at the MacDougall-Walker Correctional Institution, and further duties described within the scope of his job description. The defendant, Captain Frey, is a Captain and unit Manager at the MacDougall-Walker Correctional Institution and is legally responsible under Color of State Law to secure the Constitutional Rights (1st Amendment Rights, 5th Amendment Rights, 8th Amendment Rights, 13th Amendment Rights, 14th Amendment Rights, Rights afforded to prisoners under the

Connecticut General Statutes, the Connecticut State Constitution, the United States Constitution, and Federal and State Acts) of its wards.

23. The defendant, Captain Donahue, relevant to this Complaint is Captain at the Northern Correctional Institution. He is legally responsible under Color of State Law for investigating, issuing disciplinary Reports, duties described within his job description, and for reporting information to his superiors such as Assistant attorney General, Attorney General, Connecticut Department of Correction's Commissioner Theresa Lantz, and all mentioned parties as defendants in this action. He is further legally responsible under color of State Law for securing the Constitutional Rights (1st Amendment Rights, 5th Amendment Rights, 8th Amendment Rights, 13th Amendment Rights, 14th Amendment Rights, and Rights afforded to prisoners under the "Religious Land Use And Institutionalized Persons Act", 42 U.S.C. § 2000cc-1, 2, 3, 4, 5, 6, and 7) of its wards.

24. The defendant, Doctor Silvis, relevant to this Complaint is legally responsible under Color of State Law for supervising, evaluating,

prescribing medication, prescribing medical treatment, giving- providing medical treatment, and further duties described within the scope of his job description. The defendant, Doctor Silvis, is a doctor at the MacDougall- Walker Correctional Institution and is legally responsible under Color of State Law to secure the Constitutional Rights (1st Amendment Rights, 5th Amendment Rights, 8th Amendment Rights, 13th Amendment Rights, 14th Amendment Rights, Rights afforded to prisoners under the Connecticut General Statutes, the Connecticut State Constitution, the United States Constitution, Federal and State Acts) of its wards.

25. The defendant, Lieutenant Silver, relevant to this Complaint is legally responsible under Color of State Law for investigating, affording Disciplinary Infractioned prisoners due process Rights, and making judgment in Disciplinary Reports. She is further legally responsible under color of State Law for Securing the Constitutional Rights (1st Amendment Rights, 5th Amendment Rights, 8th Amendment Rights, 13th Amendment Rights, 14th Amendment Rights, and Rights afforded to prisoners) of its wards.

26. The defendant, Andrew Johnson, relevant to this complaint is legally responsible under Color of State Law for investigating incidents, filing documents, and duties described within the scope of his job description. He is further legally responsible under Color of State Law to Secure the Constitutional Rights (1st Amendment Rights, 5th Amendment Rights, 8th Amendment Rights, 13th Amendment Rights, 14th Amendment Rights, and Rights afforded to prisoners) of its wards.

27. The defendant, Lieutenant Allen, relevant to this complaint is legally responsible under Color of State Law for supervising the functions of Correctional officers and happenings (activities) at MacDougall-Walker Correctional Institution, including the visiting room, reviewing surveillance Cameras, Conducting investigations, etc., and further duties described within the scope of his job description. The defendant, Lieutenant Allen, is a Lieutenant Correctional Officer at MacDougall-Walker Correctional Institution, and is legally responsible under Color of State Law to Secure the Constitutional Rights (1st Amendment Rights, 5th Amendment Rights, 8th Amendment Rights, 13th Amendment Rights, 14th Amendment Rights, and Rights afforded to Prisoners and

Prisoners' Families (Visitors) under Connecticut General Statutes, the Connecticut Constitution, the United States Constitution, and Federal and State Acts) of its wards and Free Citizens.

28. The defendant, Maureen Allen, relevant to this complaint is the MacDougall-Walker Correctional Institution's Disciplinary Report Investigator. She is legally responsible under Color of State Law for investigating incidents reported in Disciplinary Infranctions (Reports), for filing Disciplinary hearing documents, and for presenting the facts of incidents to the Disciplinary Hearing Officer(s), all actions are governed by "Connecticut Department of Correction's Administrative Directive (s)", which are governed by State Law under the "Administrative Procedure Act". She is further legally responsible under Color of State Law to secure the Constitutional Rights (1st Amendment Rights, 5th Amendment Rights, 8th Amendment Rights, 13th Amendment Rights, 14th Amendment Rights, and Rights afforded to prisoners by state of Connecticut and Federal Laws) of its wards.

29. The defendant, Correctional Officer Sanchez, relevant to this Complaint is legally responsible under Color of State Law for searching cells, investigating,

issuing Disciplinary Reports, and further duties described within the scope of his job description. He is a Correctional Officer at the MacDougall-Walker Correctional Institution, and he is further legally responsible under Color of State Law to secure the Constitutional Rights (1st Amendment Rights, 5th Amendment Rights, 8th Amendment Rights, 13th Amendment Rights, 14th Amendment Rights, and other Rights afforded to prisoners) of its wards.

30. The defendant, Gary Trowers, relevant to this Complaint is a Correctional officer at MacDougall-Walker Correctional Institution and is legally responsible under Color of State Law for operating the MacDougall-Walker Correctional Institution's visiting room, and further duties described within the scope of his job description. The defendant, Gary Trowers, is further legally responsible under Color of State Law to secure the Constitutional Rights (1st Amendment Rights, 5th Amendment Rights, 8th Amendment Rights, 13th Amendment Rights, 14th Amendment Rights, and other Rights afforded to Connecticut State Prisoners and Prisoners' Families under the Connecticut State Constitution and the United States Constitution, Federal and State Acts, etc.) of its wards and of Free Citizens.

31. The defendant, Clifford Madison, relevant to this Complaint is legally responsible under Color of State Law for supervising the functions and activities of the MacDougall-Walker Correctional Institution's J-unit and further duties described within the scope of his job description. The defendant, Clifford Madison, is a correctional officer at the MacDougall-Walker Correctional Institution and is legally responsible under Color of State Law to secure the Constitutional Rights (1st Amendment Rights, 5th Amendment Rights, 8th Amendment Rights, 13th Amendment Rights, 14th Amendment Rights, and Rights afforded to Prisoners under Connecticut State Statutes, the Connecticut State Constitution, the United States Constitution, and Federal and State Acts) of its wards.

32. The defendant, Correctional Officer Arzt, relevant to this complaint is legally responsible under Color of State Law for being a member of Security and further duties described within the scope of his job description. The defendant, Correctional Officer Arzt, is a correctional officer at the MacDougall-Walker Correctional Institution and is legally responsible under Color of State Law to secure the Constitutional Rights (1st Amendment Rights, 5th Amendment Rights,

8th Amendment Rights, 13th Amendment Rights, 14th Amendment Rights, Rights afforded to Prisoners under the Connecticut General Statutes, the Connecticut State Constitution, the United States Constitution, and Federal and State Acts) of its wards.

33. The defendant, Correctional officer Sharon, relevant to this Complaint is legally responsible under Color of State Law for supervising and operating the functions of inmates in assigned units at the MacDougall-Walker Correctional Institution, and further duties described within the scope of his job description. The defendant, correctional officer Sharon, is a correction officer at the MacDougall-Walker Correctional Institution and is legally responsible under Color of State Law to Secure the Constitutional Rights (1st Amendment Rights, 5th Amendment Rights, 8th Amendment Rights, 13th Amendment Rights, 14th Amendment Rights, Rights afforded to Prisoners under the Connecticut General Statutes, the Connecticut State Constitution, the United States Constitution, and Federal and State Acts) of its wards.

34. The defendant, James Dzurenda, relevant to this complaint is legally responsible under Color of State Law for supervising and operating the activities and functions of Staff and inmates at the Garner Correctional Institution and further duties described within the scope of his job description. The defendant, James Dzurenda, was the Warden at the Garner Correctional Institution (now District Administrator for the Southern District) and further duties described within the scope of his job description. The defendant, James Dzurenda, was the Warden at the Garner Correctional Institution and is legally responsible under Color of State Law to secure the Constitutional Rights (1st Amendment Rights, 5th Amendment Rights, 8th Amendment Rights, 13th Amendment Rights, 14th Amendment Rights, Rights afforded to prisoners under Connecticut General Statutes, the Connecticut State Constitution, the United States Constitution, and Federal and State Acts) of its wards.

35. The defendant, Lieutenant Neil Gormeir, relevant to this complaint is legally responsible under Color of State Law for investigating, affording due process Rights to infractioned prisoners, and making judgments/Rulings on

disciplinary reports.
The defendant Neil Cormeir is further legally responsible under color of State Law for securing the Constitutional Rights (1st Amendment Rights, 5th Amendment Rights, 8th Amendment Rights, 13th Amendment Rights, 14th Amendment Rights, and Rights afforded to prisoners under Connecticut General Statutes, the Connecticut State Constitution, the United States Constitution, and Federal and State Acts) of its wards.

# IV. BACKGROUND OF FACTS.

~~36. The Plaintiff Joe Burgos Vega, a.k.a.~~ Amin Abdul-Baqee Khan, is a natural born Citizen of the United States of America, a member of an identifiable Class defined by legislation as Hispanic/Latino/Puerto Rican.

37. The Plaintiff Joe Burgos Vega (hereon forward will be referred to as the Plaintiff) is a sincere Muslim, and has been a Muslim over 16 years.

38. The Plaintiff is a member of the Islamic Community at large, has attended Islamic Services and participated in all other forms of Islamic worship, whenever practicable, since his incarceration.

39. The Plaintiff in this Civil Rights Action Suit is a follower of the Noble Qurán and the "Sunnah" (life example, traditional examples, instructions, approvals and disapprovals, etc.) of the Holy Prophet Muhammad (peace and blessings be upon him. Hereon forward will be abbreviated as: "(s.a.w.s.)") to whom Allah (GOD) revealed the Noble Qurán approximately

1,440 years ago. The Plaintiff is sometimes referred to as a Sunnah practising Muslim.

40. The Plaintiff declares that there is no god but Allah, and that Muhammad (s.a.w.s.) is the Messenger of Allah. That the Best Guidance is from Allah found in the Noble Qurán, and the best of examples is the Sunnah of the blessed Prophet Muhammad (s.a.w.s.).

41. Since the Plaintiff's incarceration he has had the opportunity to utilize time wisely, study extensively and successively from elementary Islamic Education to higher grades in Islamic Education, practices, and Sciences. As a result of the above studies the Plaintiff has established for himself a very good and well founded understanding of Islam.

42. According to Connecticut General Statute § 18-78a "APPICABILITY OF UNIFORM ADMINISTRATIVE PROCEDURE ACT TO DEPARTMENT..." defines the complete scope of applicability of the Uniform Administrative Procedure Act to the Connecticut Department of Correction and its officials, the defendant(s), in their official Capacity (ies).

43. § 18-78a does apply to the Connecticut Department of Correction and its officials, the defendant(s).

44. The "UNIFORM ADMINISTRATIVE PROCEDURE ACT" for the State of Connecticut is set out within the Connecticut General Statutes § 4-166 through § 4-189h and beyond.

45. During the time of the following violation(s) Connecticut General Statute under the Uniform Administrative Procedure Act, § 4-169 ..."APPROVAL OF REGULATION BY ATTORNEY GENERAL", sets out the criteria for adoption, amendment or repeal of any State of Connecticut Administrative Regulation(s).

46. Under the Administrative Procedure Act for the State of Connecticut § 4-169 represent(ed), but not limitted to, that:

a. "... The review of such regulation by the attorney General shall be limited to a determination of legal sufficiency of the proposed regulation."

b. "If the Attorney General or his designated representative fails to give notice to the agency of any legal insufficiency within thirty days of the receipt of the proposed regulation, he shall be deemed to have approved the proposed regulation for purposes of this section."...

c. "... Legal Sufficiency means (1) the absence of conflict with any general statute or regulation, Federal Law or regulation or the Constitution of this State or of the United States, and (2) Compliance with the notice and hearing requirement of section 4-168."

47. On or around July 4th, 2003 the Plaintiff Filed a Civil Rights Complaint at the United States District Court, District of Connecticut, which was issued docket number 3:04CV1215 (DFM).

48. The Plaintiff was Pro-Se on the matter of 3:04CV1215 (DFM) for years, until the Court granted appointment of Counsel. The Law Offices of McCarter and English, LLP, City Place 1, 185 Asylum Street, Hartford, Connecticut 06103 now represents the Plaintiff on the mentioned Action.

49. Prior to the appointment of Counsel the Plaintiff had to do all the pleadings and filings by himself. In order to maintain a personal copy and provide defendants with copies of pleadings and filings the Plaintiff had to hand over his legal privileged documents into the hands of Connecticut Department of Correction official(s) in order to get photo-copies made at .25¢ a copy. The official(s) would hold on to the legal document(s) until the next day, reviewing its content(s) and reading it, then it would be circulated over to the Unit-manager, who would then decide weather or not to return the document(s) to the Plaintiff.

50. While the legal and privileged document(s) were in direct possession and control of officials the document(s) were being read,

extra photo copies were being generated for administrative official(s), and not just limited to being read, photo-copied, and circulated.

51. Prior to the Plaintiff's filing of Civil Rights Action 3:04CV1215 (DFM), the Plaintiff's disciplinary history was good with the exception of a couple minor blemishes. After the filing of 3:04CV1215 (DFM) the defendants, their cohorts, their subordinates, and all those acting in active conjunction with them conspired together subjecting continuously the Plaintiff to retaliatory conspiratorial action(s) and conspiratorial disciplinary actions, known and unknown.

52. On or around July 2005 the Plaintiff requested authorization to purchase a "non-commissary sold item", namely an Islamic male silver ring, authorization sought from Administrator Unit Manager Captain Alfredo Gonzalez.

53. Defendant Alfredo Gonzalez instructed the Plaintiff to obtain "Request Validation" from the facility's Islamic Chaplain Askia Muhammad, a.k.a. Glenn Sullivan.

54. On or around August 5, 2005 the Plaintiff requested and obtained "Request Validation" From [redacted] thereafter, the Plaintiff gave the "Validated Form" to Administrator Unit Manager Captain Alfredo Gonzalez.

55. Late August of 2005 Administrator Unit Manager Captain Alfredo Gonzalez informed the Plaintiff that the requested Islamic Praying oils and the Islamic male silver ring were approved. He, Alfredo Gonzalez, gave the Plaintiff an authorized Form to have attached to the package when shipped/mailed to the Facility with the instructions of having the package mailed directly to him. The Plaintiff did as instructed and Followed orders.

56. During September of 2005 the Plaintiff's Family mailed the authorized Islamic Praying oils and the Islamic male Silver Ring to the defendant captain Alfredo Gonzalez, at MacDougall-Walker Correctional Institution, 1153 East street South, Suffield, Connecticut 06080.

57. Upon receiving the Islamic Praying Oils and the Islamic male Silver Ring the defendant Alfredo Gonzalez inventoried the Plaintiff's Islamic male Silver Ring into the Plaintiff's Inmate Property Inventory Form, (CN61001, Rev. 02-11-03), then authorized and issued the items to the Plaintiff. Thereafter, the items were in the personal possession of the Plaintiff. The Plaintiff worn the Islamic male Silver Ring in accordance to the "Sunnah" (Traditional essential example) of Prophet Muhammad (s.a.w.s).

58. On or around January 7, 2006 after a family visit Correctional officer Teller questioned the Plaintiff about the Islamic male Silver Ring. Correctional officer Lawrence intervened and advised officer Teller that the Plaintiff had authorization for the Islamic male silver Ring.

59. The Plaintiff's authorized Islamic male Silver Ring never set-off any of the MacDougall-Walker Correctional Institution's Metal detector, nor were there any jealosy amongst inmates that the Plaintiff had an authorized Islamic male Silver Ring of essential Islamic Religious significance toward the Practice

of the Plaintiff's Religious Beliefs and Religion. Prisoners are allowed wedding bands.

---

60. On January 12, 2006 the day of Celebrating the Islamic Eid-Ul-Adha, the Feast of the Sacrifice, it was made known to the Plaintiff (and other Muslims) at MacDougall-Walker Correctional Institution that the defendant Anthony J. Bruno, the Director of Religious Services, placed and issued a policy prohibiting incoming donated or purchased Halal-Zabihah (Islamically prescribed Sacrificed Meats) meats, foods, and beverages from entering any Connecticut Department of Correction Facility.

61. Prior to January 12, 2006 Islamic Mosques, Masjids, and Temples were allowed to send donated Halal-Zabihah (Islamically Prescribed Sacrificed Meats) in medically Sealed bags and/or boxes. The donated food items were mailed directly to the Facility's Kitchen supervisor, who would then inspect and approved or deny the food for preparation and Consumption.

67. The essential Eid-Ul-Adha meal is the "Sacrificed Camel, Cow, Sheep, or goat meat". Any other meat served is of no Religious significance. Fish if served is of no Religious Significance.

68. The defendant(s) did not provide the Eid-Ul-Adha's essential Halal-Zabihah Meat.

69. According to Islamic Sacred Law (Shariah) the Eid-Ul-Adha's Essential Zabihah are meats of: Camel, Cow, Sheep, or Goat. Pursuant to "The Reliance Of The Traveller," A Classic Manual of Islamic Sacred Law, J. 14. 2, at page: 358.

70. MacDougall-Walker Correctional Institution's Islamic Chaplain Imam Askia Muhammad, a.k.a. Glenn Sullivan, had discussed, advised, and strongly recommended the essential requirement of serving Halal-Zabihah at the January 12, 2006 Islamic Eid-Ul-Adha essential Celebration. This information was provided to the defendant(s), Anthony J. Bruno, Abdul Majid Karim Hasan, and others who intentionally and deliberately searched for innovative ways to disregard the essentials of the essentially prescribed Islamic Eid-Ul-Adha's acts of worship which incorporates the Halal-Zabihah Meat(s). The

62. Defendant(s)' new unannounced/unpublicized Religious Food Regulation created an atmosphere [redacted] that all non-Muslims (all other Religious Festivaties) were being provided cuts of meats of high cost(s) that Muslim(s) were not, (i.e. Roast Beef, Corned Beef, etc.), during their Religious Festivaties.

63. The other Religious Festivaties' meat(s) are more expensive than equivalent regular or Common Fare menu's, therefore, the defendant(s) covered/payed the extra cost(s).

64. The defendant(s)' policy was designed to exclude Muslims' (the Plaintiff's) from Celebrating their (his) Islamic Essential Festivaties as Essentially Prescribed.

65. The defendant(s)' policy clearly reflects Favoritism and discriminatory bias.

66. The defendant(s) covered the extra Costs for Other Faiths Festivaties (Christian, Catholic, Pentecostal, Jewish, Native American, etc.) but excluded covering nominal amount of additional Cost(s) for Islamic Meal(s) On Islamic Main Festivaties.

defendants not only denied the Plaintiff's (and other Muslims') rights to exercise his Religion [redacted] Correct advice of a well known and intellectual Islamic Imam, Imam Askia Muhammad a.k.a. Glenn Sullivan. This information was disclosed by Imam Askia Muhammad in a very sad and apologetic speech on the evening of January 12, 2006.

71. The defendant(s) disregarded Imam Askia Muhammad's advice and provided breaded fish as the only main meal for the Eid-Ul-Adha Feast on the advice of the defendant Abdul-Majid Karim Hasan and other members of a deviant sect who taught and spreaded far and wide the false teachings that white men, women, and their babies were devils. My God! My God! My God! How can any men in the Service of God teach and spread such words of hate?

72. The Plaintiff in this action does not share the false and hateful beliefs as that of those of the defendant Abdul Majid Karim Hasan and others.

73. The Plaintiff is not and never has been a member of a Black or Hispanic Nationalist organization.

74. As a result of the defendant(s)' discriminatory, retaliatory, and overburdensome action(s) and inaction(s) the Plaintiff (and other Muslims) was Compelled to modify his Islamic essential beliefs and practices in ways that are forbidden, and totally deprived the Plaintiff of an essential Islamic Eid-Ul-Adha Festivaty meal on January 12, 2006.

75. The policy placed by the defendant(s), Anthony J. Bruno, Abdul Majid Karim Hasan, and others was designed in a discriminatory and retaliatory fashion using a blanket excuse to justify placing a retaliatory policy with intent to deter all Islamic Faith essential worship.

76. The Plaintiff Complained about the defendants' actions and inactions, and had no other alternative than to file a grievance to exhaust his administrative remedies. Line Grievance was issued an IGP No. 137-07-147, and the Plaintiff's Administrative remedies were exhausted.

77. On January 13, 2006 the Plaintiff had some dental work done on his right side lower tooth. The dentist insisted, against the Plaintiff's will to fill an alleged begining cavity. Thereafter the Plaintiff was experiencing excruciating pain.

78. Due to the defendant's, Thomas Thalody, action(s) the Plaintiff was in excruciating throbbing pain, could not eat, his jaw could not open, and felt as if the jaw bone was pinned by another bone near the top of the right ear not allowing it to open for nearly two long and painful months. It was the wurst physical pain this plaintiff ever had to endure.

79. On January 15, 2006 the Plaintiff submitted an inmate request requesting to be seen and treated by either the medical or the dental department. Days went by while in excruciating pain nor pain medication to alleviate the throbbing pain, the medical and/or the dental department neglected the Plaintiff's requests.

80. On January 19, 2006 the Plaintiff submitted a Second inmate request form addressed to the medical department requesting to be treated for the

excruciating pain.

81. On January 23, 2006 the Plaintiff informed Correctional officer Grasso stationed at the MacDougall-Walker Correctional Institution's J-1 unit about the Plaintiff's Condition and the many attempts at getting any medical treatment without success. Later that day the Plaintiff informed the defendant Alfredo Gonzalez who made no attempt to get the plaintiff treated.

82. On January 25, 2006 the Plaintiff filed an Emergency Line Grievance requesting to be treated by the medical department, and handed it to the defendant Alfredo Gonzalez who was the MacDougall-Walker Correctional Institution's Administrator Unit Manager for the J unit.

83. The Connecticut Department of Correction Administrative Policy, on January of 2006, on Medical Emergency Line Grievances required either a response or action within (8) eight hours from the time the Medical Emergency Line Grievance is filed.

84. Since the eight (8) hours had passed without getting any response nor any treatment the Plaintiff Complained and informed Lieutenant

Thompson on January 26, 2006. Lieutenant Thompson showed concern and informed the Plaintiff that he would talk to (defendant) Richard Furey the Director of the Medical Department.

85. On January 26, 2006 at approximately 2:00 p.m. the Plaintiff complained to Major John Lahda who was touring the MacDougall-Walker Correctional Institution's J-unit along with Captain Alfredo Gonzalez.

86. Captain Alfredo Gonzalez jestered something to Major John Lahda and Major Lahda admonished Captain Alfredo Gonzalez stating ... "after taking that coarse of action and not getting any result he is entitled to bring his grievance to me".

87. On January 27, 2006 the Plaintiff filed another Medical Emergency Line Grievance regarding the Plaintiff's excruciating pain and untreated medical condition. The Plaintiff explained his prior fillings while not getting any form of treatment. The Medical Emergency Line Grievance was handed to Lieutenant Thompson who hand delivered it.

88. On January 27, 2006 at approximately 1:00 p.m. the Plaintiff was summoned and seen by the defendant Thomas Thalody, the dentist who caused the plaintiff's excruciating pain and medical condition.

89. While the Plaintiff was at the dentist lab the defendant Thomas Thalody and his assistant displayed alot of secrecy while evaluating the Plaintiff. The Plaintiff was able to observe the Medical Emergency Line Grievance as the assistant entered the lab and showed it to the defendant Thomas Thalody.

90. On or around January 27, 2006 due to the condition caused by the defendant Thomas Thalody the Plaintiff was X-rayed. Later prescribed muscle relaxant by doctor Silvis.

91. On January 27, 2006 at approximately 1:40 p.m. after returning from the dentist lab and being X-rayed, the Plaintiff exited J-unit and was on his way toward the announced Friday Islamic Jumuah Service. The J-unit Manager, defendant Alfredo Gonzalez, called the Plaintiff in front of his office and ordered the Plaintiff to hand-over the Plaintiff's Islamic male Silver Ring, which he himself had authorized

and inventoried into the Plaintiff's Property Inventory Sheet and Stated "... you cry too much, I dont like being questioned and having to give answers on my work ethics and how I do my job."

92. The Plaintiff was ordered and compelled to hand-over his Islamic Religious Silver Ring to the defendant Alfredo Gonzalez. Alfredo Gonzalez acted out of retaliatory motives because the Plaintiff had filed an Emergency Line Grievance with the defendant and he out right disregarded it or acted with extreme negligance which resulted in the Emergency Line Grievance not being filed within the time intended.

93. On January 30, 2006 the Plaintiff was issued an envelope from the Medical Department Supervisor Rich Furey who enclosed:

a. The January 25, 2006 Emergency Line Grievance originally filed/handed to defendant Alfredo Gonzalez. It revealed that the Emergency Line Grievance dated January 25, 2006 was not submitted and/or processed until January 30, 2006.

b. The January 27, 2006 Medical Emergency Line Grievance which was issued an IGP No. 137-06-054 and all allegations were upheld; therefore, administrative remedies were and has been exhausted.

94. Shortly after the defendant Thomas Thalody damaged the Plaintiff's jaw and filled an unnecessary tooth, during the month of July or August of 2006 the tooth began to fall apart. If it would not had been for the defendant's harm(s) on the Plaintiff, the Plaintiff would not have been experiencing:

a. Excruciating pain when the Plaintiff chews with the tooth the defendant damaged on right side.
b. Excruciating pain on the Plaintiff's left side facial and jaw muscle(s).
c. Complications with the Plaintiff's jaw bone — the Plaintiff cannot fully shut his jaw bone (mouth) when waking-up. The Plaintiff needs immediate adequate dental repairs.

95. On January 30th, 2006 the Plaintiff wrote a letter to A.A.G. Steven R. Strom complaining and informing him about the defendants', Alfredo Gonzalez's and others', unconstitutional action(s) — the deprevation of the Plaintiff's authorized Islamic silver ring which has an overwhelming amount of Religious significance, sentiment, and value to the Plaintiff.

96. The defendant(s) deprived the Plaintiff of an authorized Religious item, one Islamic male silver ring, without due process and motivated out of Personal retaliatory motives.

97. Due to the Plaintiff's letter to Steven R. Strom Connecticut Department of Correction Officials Conducted an investigation.

98. During February of 2006 inmate Richard Austin Confirmed and informed the Plaintiff of the deplorable and unsanitary conditions at the MacDougall-Walker Correctional Institution's dental clinic/Lab, along with the poor dental hygienic practices of the dentist and his assistants, the defendant(s).

99. On or around the first week of March of 2006 a Connecticut Department of Correction's official, who identified himself as Captain Donahue wanted to speak to the Plaintiff. The Plaintiff met with Captain Donahue and spoke to him but was able to notice/detect that Captain Donahue was already bias towards the Plaintiff. The Plaintiff expressed his feelings that Captain Donahue was already bias towards the Plaintiff and the coarse of the investigation, for that reason Captain Donahue dismissed the Plaintiff ending the meeting.

100. On or around March 9, 2006 the Plaintiff was issued a disciplinary report by the defendant Captain Donahue for having allegedly given false information to Captain Alfredo Gonzalez on February 21, 2006.

101. The disciplinary report issued to the Plaintiff by Captain Donahue was part of an ongoing retaliatory action(s) on the Plaintiff because of the Plaintiff's writting to the Attorney General's office, filing Line Grievances, addressing unlawful and UnConstitutional action(s) inflicted upon him by the defendent(s) to the United States District Court for redress, and not limited to just the Stated facts.

102. On March 13, 2006 the Plaintiff wrote another letter to A.A.G. Steven R. Strom where the Plaintiff notified and complained about the defendants' retaliatory actions, namely the retaliatory disciplinary report authored by Captain Donahue dated March 9, 2006.

103. The Plaintiff did not give Captain Alfredo Gonzalez false information.

104. Defendant Captain Donahue attempted to

cover-up for Captain Alfredo Gonzalez by issuing the Plaintiff a Disciplinary Report alleging the [redacted] Alfredo Gonzalez.

105. The defendant(s), Captain Donahue, Captain Alfredo Gonzalez, and other(s) involved conspired to discredit the Plaintiff and have him disciplined for something not committed. The Plaintiff is very grateful to God that he had established and kept a paper trail (copies) of documents to have him cleared of the falsefied and retaliatory allegations through the Connecticut Department of Correction's Administrative Disciplinary process, therefore, the plaintiff has exhausted his Administrative remedies.

106. On or around the ending week of March of 2006 the Plaintiff was informed that approximately 71% of the Connecticut Department of Correction inmate population are H.I.V. positive by the "Beyond Fear" facilitator Ms. Alba DelValle.

107. On or towards the ending of the month of March of 2006 the Plaintiff noticed that he as a Muslim (and other Muslims) was being excluded from having a Halal (Certified Islamically

Approved) Holiday Food package(s) during the time all Holiday packages are made available to the Connecticut Department of Correction's general population except the Islamic Muslim inmate population and addressed it to the dependant Rene Kreda, who did not respond.

108. The Holiday Food package event is a once a year event that allow inmates, without any disqualifications, to purchase foods and beverages not sold or made available through the Connecticut Department of Correction's Commissary.

109. On April 4, 2006 the Plaintiff notified the MacDougall-Walker Correctional Institution's Islamic Chaplain, Askia Muhammad a.k.a. Glenn Sullivan, that the Plaintiff (and other Muslims) is being excluded from participation and/or is not being offered an Islamic Holiday Food Package(s) for purchase(s) either during the Islamic Holidays or during the occassional Holiday Food Package(s) Season, the months of November through December of every year.

110. Imam Askia Muhammad forwarded the Plaintiff's request form to the dependant Rene Kelda (Religious Coordinator) who never replied to

the Plaintiff.

111. On April 7, 2006 the Plaintiff filed a Line grievance asking for authorization to order from the Connecticut Department of Correction Holiday Food package(s) Islamically Approved Halal Certified Food(s) during the Islamic Holy Month of Ramadan, or from an outside authorized food vendor, but to not leave me (and other Muslims) without participation. The Line Grievance was issued an IGP No. 137-06-190, which was denied by the defendant Warden John Sieminski.

112. According to Connecticut Department of Correction Administrative Directive 6.10, titled: "Inmate Property", paragraph #33, every inmate, the Plaintiff (and other Muslims), "shall" be authorized to purchase one "Holiday Food Package" per year, if the inmate does not have any disqualifications.

113. The Plaintiff (and many other Muslims) did not and has no disqualification(s) to have kept him from participating in or have purchased "Holiday Food Package(s)". Halal Islamic Foods are easily made available. The Plaintiff even submitted an Islamic Food distributor Catalog, names and addresses, yet, the defendants denied the Plaintiff's request(s).

114. On April 12, 2006 on the last day the defendant Correctional Officer Sharon would work at the MacDougall-Walker Correctional Institution's J-1 unit, defendant Correctional officer Sharon issued the Plaintiff a disciplinary report for using cleaning solution in a spray-bottle, yet disregarding his coworker's (C.O. Facey) explenation that she gave the Plaintiff permission to use the cleaning spray-bottle containing solution to clean-up blood.

115. On April 12, 2006 the Plaintiff had sought permission from Correctional Officer Facey to use the spray-bottle containing cleaning solution. She granted the plaintiff permission to clean-up the deplorable and very hazardous living condition(s) which the Plaintiff was being (and still is but in different way) compelled to live under.

116. There was blood, urine, and who knows what else all over the cell assigned to the Plaintiff. There was visible blood on the door handle, on the cell floor, on the sink and toilet area, all over. The blood came from the Plaintiff's cell-mate, Fermin Rodriguez, a blind, sick, old man who is/was diabetic.

117. Correctional Officer Sharon totally disregarded

his co-worker's explenation, and told the Plaintiff ..."this is what we do to legal-beagle(s)".

---

118. "Legal-Beagle(s)" is a term used in prison settings to refer to a Jail-House Lawyer(s).

119. The Plaintiff went through the Administrative disciplinary process. He gathered his evidence and witness then presented it to the disciplinary hearing officer. After some delay in contacting the Plaintiff's witness, Correctional officer Facey, the Plaintiff was cleared of any wrong doing. The plaintiff after going through the Disciplinary Administrative process has therefore exhausted his Administrative remedies.

120. On April 14, 2006 the MacDougall-Walker Correctional Institution Islamic Chaplain, Askia Muhammad a.k.a. Glenn Sullivan, answered Plaintiff's "Inmate Request Form" where the Plaintiff asked a series of questions. He answered: "(1) First Question: Meat is the essential meal for the Eid-Ul-Adha. (2) Second Question: It is essential to make congregational prayers. (3) Question three: No, a Muslim cannot claim to be a vegetarian as part of his faith, without medical reason. (4) Question 4: The

oils sold in the Commissary has chemicals in them, they are not atars."

121. On April 26, 2006 the Plaintiff filed an Appeal to line Grievance IGP No. 137-06-190, which was then discriminately and unjustly denied by the defendant defendant Wayne T. Choinski. His perversed reason for the continued Religious disparity ---"you are appealing a level 1 grievance concerning availability of religious items in the Commissary. There are more than 40 items in the Commissary available for purchase that meet the Halal requirement. Your level 2 appeal is denied." The defendant Wayne T. Choinski crossed out the box where it states ..."This grievance may not be appealed to level 3"-- Therefore, the Plaintiff has exhausted his administrative remedies.

122. On April 26, 2006 the Plaintiff asked the "Beyond Fear" Facilitator Ms. Alba Delvalle if she would confirm in writing her statement that approximately 71% of Connecticut Department of Correction inmates are H.I.V. positive. Ms. Alba Delvalle confirmed it in writing on an Inmate Request Form.

123. On April or May of 2006 the Plaintiff filed a Line Grievance which was upheld for the Plaintiff to store disinfecting cleaning supplies in the cell,

due to the inhumane, deplorable, hazardous living Condition(s), as long as the Plaintiff remained housed/celled with inmate Fermine Rodriguez, however, the condition still exist even when housed with other than inmate Fermine Rodriguez and the defendant(s) refuse to do anything about it and turn a blind eye to the existing fact(s).

124. The living condition(s) described above are not limited toward living with inmate Fermine Rodriguez but are part of every day life within the Connecticut Department of Correction.

125. The Plaintiff witnesses cotton balls full of blood on top of dining tables, inside eating trays, salt and pepper shakers smeared with blood, etc., therefore, exposing the Plaintiff (and other Prisoners) to highly contagious deadly deceases, such as but not limited to: HIV, Hepatitis, Methicillin resistant staphylococcus aureus (MRSA), and much more.

126. The Plaintiff (and other inmates) are exposed to highly contagious and deadly deceases by being compelled, by the defendant(s), to use nasty re-used (not new) uniforms, pants, shirts, sheets, blankets, pillows, pillow cases, towels, mattresses, etc.

127. Exposing the Plaintiff (and other inmates) to highly contagious deadly deceases will lead to contraction.

128. A simple cleaning house-hold item known as bleach is known to be highly effective in cleaning biohazardous waste. The Connecticut Department of Correction has discontinued allowing bleach for the cleaning of blood, other bodily fluids, toilets, showers, cells, housing units, uniforms, underclothes, etc.

129. Studies show that the biggest incubators of highly contagious and deadly deceases are our Nation's 5,000 plus prisons and jails, the Connecticut Department of Correction's Prisons, Institutions, jails, etc., are included.

130. These biohazardous and infectious deadly deceases thrives and spreads the fastest in poorly ventilated living and sleeping quarters, overcrowded dorms, rooms, cells, shared mattresses, shared pillows, shared sheets, shared blankets, shared towels, shared uniforms, shared toilets and showers, etc. (Shared means re-used/re-issued).

131. The defendant(s) have not and continue not to put an emphasis on providing sufficient

soap(s) and sanitary condition(s) to stop the spread of bacteria and infectious deceases.

---

132. Inmates (the Plaintiff) are indigent and/or at times become indigent by having less than $5.00 in their/his inmate account for a period of 90 days, yet in the time in between the 90 days period the defendant(s) refuse the Plaintiff (and other inmates) soap, toothpaste, toothbrush, lotion, shaving razors, shampoo, deodorant, T-shirts (3 minimum), underwear (3 minimum), socks (3 minimum), work boots, social and legal envelopes, etc., because of the defendants' Connecticut Department of Correction Administrative Directive Policy requiring an inmate to have less than $5.00 for an entire 90 days period to be classified indigent.

133. The present indigent policy is deliberately indiferent, neglectful, unrealistic, and in violation of the plaintiff's (and other inmates') Constitutional Rights.

134. The present $3.00 medical co-pay is another barrier why many prisoners, the plaintiff included, either: (a) dont have the financial means to afford what may seem to be a nominal amount when

Compared to free world standards; (b) May cause prisoners to become self evaluators and/or self doctored. This present condition created by the defendants may cause to complicate a serious health condition when it may seem like something small to the prisoner due to avoiding having to pay $3.00.

135. On or around September 10, 2006 during the early a.m. hours the Plaintiff was attacked while sleeping and physically assaulted by his cell-mate inmate Steven Necaise #210339 (Here on Forward will be referred to as the assailant).

136. The assailant attempted to choke the Plaintiff with a cord object, cut the Plaintiff's face, and brutally beat on the Plaintiff.

137. Defendant, Correctional Officer Clifford Madison on shift refused and/or failed to investigate the loud yelling and the calling upon the Correctional officer as the Plaintiff tried to ward off the assailant.

138. On September 11, 2006 the Plaintiff was attacked by the assailant again as the plaintiff attempted to exit the cell to shower at approximately 2:15 p.m.

139. The Plaintiff suffered multiple lacerations on the left eye, bruises to the face, bites, cuts and scratches, huge injury to the Plaintiff's hip Furthering the Plaintiff's back medical complication(s).

140. Due to the above attack the MacDougall-Walker Correctional Institution's psychiatric staff diagnosed the Plaintiff to be suffering from "Post Traumatic Stress".

141. The Plaintiff now has difficulties being able to fall asleep and cannot fall asleep normally like before.

142. The Plaintiff is now startled by any cell-mate's sudden movement(s) and/or noise(s) while asleep and while awake causing the Plaintiff to suffer from high level(s) of anxiety and stress, and it continues to wursten due to double celling.

143. The Defendant(s) Compells the Plaintiff (and other High security inmates) to double cell occupancy for approximately twenty-one (21) hours a day in a cell originally designed for single occupancy. Without out of cell programing(s).

144. Cell space is extremely limited and not enough for two inmates confined and/or sentenced

to serve long sentences such as lifers.

145. After the Plaintiff was attacked and diagnosed with "Post Traumatic Stress", the Plaintiff requested single cell accupancy in the general population. The Plaintiff's "Post Traumatic Stress" condition continues to wursten, being startled, not being able to sleep, sleep deprivation, feeling highly tired and irritable, not trusting cell-mates, etc., yet the defendant(s) denied the Plaintiff's request.

146. There are other inmate(s) throughout the Connecticut Department of Correction Level 4 High Security Facilities who are provided single-cell status in the general population due to the very same health complication(s) as that of the Plaintiff's.

147. During the investigation of the assault on the Plaintiff, the assailant disclosed information that he had informed correctional official(s) that he tried to get moved out of the cell which the defendant(s) obviously ignored, and therefore, lead the assailant to attack the Plaintiff.

148. The defendant(s) are responsible for the assailant attacking and assaulting the Plaintiff.

149. On September 11, 2006 the assailant informs Correctional Officials his reason(s) for attacking and ~~assaulting the Plaintiff "... things needed to be~~ settled". This information was with-held from the Plaintiff, the Plaintiff's advocate, and the Disciplinary Hearing Officer by defendant(s) Andrew Johnson and Maureen Allen. The Plaintiff found-out later; almost a year later through attorney and discloser of documents.

150. On September 11, 2006 after the Plaintiff and his assailant were placed at the MacDougall-Walker Correctional Institution's Restrictive Housing Unit (hereon forward will be abbreviated as RHU), commonly known as segregation, pending disciplinary hearing. The Plaintiff was issued two (2) disciplinary reports:

a. M-WCI 0609065, "Fighting", Class A;
b. M-WCI 0609058, "Contraband", Class A.

151. Disregarding the facts witnessed and reports made by eye-witness defendant Clifford Madison describing how the assailant violently assaulted the Plaintiff, and the assailant's own admission, the Plaintiff was still charged and issued a disciplinary report for "Fighting", Disciplinary Report # M-W.C.I. 0609065, Class A.

149. On September 11, 2006 the assailant informs Correctional Officials his reason(s) for attacking and assaulting the Plaintiff "... things needed to be settled". This information was with-held from the Plaintiff, the Plaintiff's advocate, and the Disciplinary Hearing Officer by defendant(s) Andrew Johnson and Maureen Allen. The Plaintiff found-out later, almost a year later through attorney and discloser of documents.

150. On September 11, 2006 after the Plaintiff and his assailant were placed at the MacDougall-Walker Correctional Institution's Restrictive Housing Unit (hereon forward will be abbreviated as RHU), commonly known as segregation, pending disciplinary hearing. The Plaintiff was issued two (2) disciplinary reports:

a. M-WCI 0609065, "Fighting", Class A;
b. M-WCI 0609058, "Contraband", Class A.

151. Disregarding the facts witnessed and reports made by eye-witness defendant Clifford Madison describing how the assailant violently assaulted the Plaintiff, and the assailant's own admission, the Plaintiff was still charged and issued a disciplinary report for "Fighting", Disciplinary Report # M-WC.I. 0609065, Class A.

152. Disregarding the facts witnessed and reports made by defendant Correctional Officer Sanchez, who allegedly "...Found a razor underneath the Television of inmate Necaise", the Plaintiff's assailant, he issued the Plaintiff a disciplinary report MWCI. 0609058, "Contraband", Class A.

153. Disciplinary report M-W.C.I. 0609058 alleged that a razor was found underneath Steven Necaise's #210339 personal property, his television stationed at his immediate personal bed area top bunk. No-where did the facts witnessed and reported by defendant Correctional Officer Sanchez implicate the Plaintiff to have had any involvement.

154. The razor belonged to inmate Steven Necaise #210339.

155. During the coarse of investigation the Plaintiff selected counselor Cooper as his advocate. The Plaintiff met with counselor Cooper and prepared a defense.

156. According to Connecticut Department of Correction Administrative Directive 9.5, titled: "Code of Penal Discipline", section 31(a) ..." A disciplinary hearing shall be convened as soon as possible but not later than seven (7) bussiness days of the date

of the disciplinary report except in the event of a transfer a hearing shall be convened within ten (10) business days."

157. The defendant(s) did not give the Plaintiff the disciplinary hearing within the Seven (7) business days of the date of the disciplinary report as mandated by Connecticut Department of Correction Administrative Directive 9.5, "Code Of Penal Discipline", on disciplinary report(s): M-W.C.I. 0609058 and M-W C.I. 0609065.

158. Disciplinary report(s) M-W.C.I. 0609058 and M-W C.I. 0609065 had to have been dismissed due to process failure, and other reasons, such as but not limited to exculpatory evidence in direct possession of the defendant(s) which they refused to bring into evidence and/or turn over as a matter of due process Compliance.

159. The defendant(s) with-held exculpatory evidence from the Plaintiff, the Plaintiff's advocate, and the Disciplinary Hearing Officer Lt. Silver.

160. A continuance was not ordered by a Disciplinary Hearing Officer for good cause shown.

161. The Plaintiff requested witness (es) Testimony, that of Correctional Officer (s): Clifford Madison and Correctional Officer Sanchez. Defendant Maureen Allen refused to honor the Plaintiff's request for witness (es) testimony and told the Plaintiff that since the reporting officers wrote the disciplinary reports the Plaintiff had no right for their testimony. She denied the Plaintiff's request.

162. Defendant Maureen Allen (and the defendants) withheld exculpatory evidence from the Plaintiff, the Plaintiff's advocate, and the Disciplinary Hearing Officer with malice motivated by retaliation due to the Plaintiff's Religious beliefs (Religion) and the known on going Civil Rights litigation before the United States District Court which was known to the defendant(s).

163. Defendant Maureen Allen distorted testimony, evidence, and reports, while concealing the exculpatory evidence that would had cleared the Plaintiff found in Incident and Investigation Reports which the Plaintiff had requested but was never issued prior nor during the disciplinary hearing.

164. On September 21, 2006 the Plaintiff was

Compelled to appear at a disciplinary hearing without the requested witness(es)' testimony, without the evidence requested, without advocate Counselor Cooper, nor the unknown (at that time) withheld exculpatory evidence for disciplinary reports M-W.C.I. 0609065 and M-W.C.I. 0609058.

165. The assigned disciplinary Hearing Officer was Lieutenant Silver.

166. The Plaintiff was read the charge(s), disciplinary investigator Maureen Allen presented her bias and un-impartial version of distorted facts, the advocate substitute said nothing, and the Plaintiff plead not guilty to Disciplinary Report # M-W.C.I. 0609065, "Fighting", However, plead "Self Defense". The plaintiff further plead "not guilty" to disciplinary report # M-W.C.I. 0609058, "Contraband (Razor)", that belonged to Steve Necaise.

167. The Razor was found in Steve Necaise's personal property, his television.

168. Defendant Maureen Allen who is suppose to be part of an impartial tribunal distorted facts alleged in report(s), etc., and claimed that the razor was found in a "Common Area", distorting the facts recorded in the disciplinary report(s).

169. The term "Common Area" is not a term mentioned, nor defined, within the Connecticut Department of Correction's Administrative Directive 9.5, tittled: "Code of Penal Discipline", nor in the MacDougall-Walker Correctional Institution's Inmate Hand Book revized by Warden John Sieminski (August of 2006), nor in the Unit's Housing Rule(s).

170. There is no depenition, term, or wording such as "Common Area" within Connecticut Department of Correction's Administrative Directive(s), nor was ever advised and/or informed. The policy amongst administrators is that the bunk(s) assigned and all property it contains belongs to the inmate assigned to that particular bunk, since 99% of all cells are double occupancy, as defined by Connecticut Department of Correction's Administrative Directive 6.10, Titled: "Inmate Property".

171. The newly created word, term, idea, etc., "Common Area", is in clear contradiction to a well established Administrative Directive (6.10) Policy which describes television, items, etc., as personal property.

172. There is no order, decree, rule, nor regulation within the Connecticut Department of Correction's Administretive Directive(s) where it orders, or implies that an inmate, the Plaintiff, must inspect his

Cell-mate's personal property to ensure that no contraband is found in his cell-mate's property, or that one, the Plaintiff, is responsible for his cell-mate's contraband found in the cell-mate's personal property.

173. Enforcement of this newly invented non-published word, term, phrase, etc., "Common Area" is in violation of the Connecticut Administrative Procedure Act which binds the Connecticut Department of Correction to abide by it.

174. Disciplinary Hearing Officer Lieutenant Silver found the Plaintiff guilty on both disciplinary reports. M-W.C.I. 0609058 and M-W.C.I. 0609065. Then issued sanctions against the Plaintiff exceeding those authorized. The Plaintiff filed his appeal(s).

175. The findings of guilty were not based on evidence. There was no allegation nor evidence that the razor belonged to the Plaintiff, and, the Plaintiff is entitled to defend himself when being attacked. There were no accusation(s) alleging that the Plaintiff committed any wrong on the disciplinary Reports.

176. The Disciplinary Hearing Officer Lieutenant Silver

did not specify what evidence was relied upon on making her finding(s).

177. Due to the finding(s) of guilty against the Plaintiff in regard to disciplinary Reports M-W.C.I. 0609058 and M-W.C.I. 0609065 the defendant(s) took away the Plaintiff's Contact visits for an excesive amount of time two (2) long years. Furthermore, taking away the Plaintiff's Contact Visits served no penological interest(s) and exceeded sanctions authorized.

178. After the defendant(s) Kept the Plaintiff in Punitive Segregation for a substancial amount of time and exceeded the amount of days Sanctioned in punitive segregation, the Plaintiff was moved and housed at the MacDougall-Walker Correctional Institution's Q-pod/unit during the Islamic Holy Month of Ramadan.

179. The Islamic Holy Month of Ramadan is the ninth (9th) Lunar Calendar month in the Muslim World in which all Muslims around the World, the Plaintiff, Fast the entire month from Pre-dawn to after sunset. It is also the fourth (4th) most essential pillar (act of Worship) in which Islam is founded upon.

180. Q-pod/unit is a general population pod/unit as defined by the MacDougall-Walker Correctional

Institution's public Records.

181. Upon the Plaintiff's arrival at Q-pod/unit the Plaintiff became aware that there were no Islamic Friday Jumuah Services being provided nor offerred to Muslims (the Plaintiff and Other Muslims) While Native American inmates at Q-pod/unit were being allowed to attend their Religious mandated worship called Smudging on the daily basis, without restriction(s).

182. Native American Inmate(s) from Q-pod/Unit and throughout the Facility are allowed to go to the Facility's outside yard during the 6:00 a.m. hours of the morning(s) to perform their Religious mandate. Called smudging.

183. Christian, Jewish, Native American, Jehova Witnesses inmates at Q-pod/Unit were being provided their weekly Religious Services without restriction(s) and always on time, while Muslim inmates, the Plaintiff, was being delliberately denied access to attend his essential Friday Jumuah Congregational Prayer Services.

184. Christian, Jewish, Native American, Jehova Witness inmates were/are given extra activities and privileges which is a very good activity for rehabilitation, however, not so good when done in a discriminatory fashion by denying Muslims, the Plaintiff, the same

knowingly and deliberately by the defendant(s).

185. Anticipating that the Islamic Eid-al-Fitr essential prayers and Feast were not going to be provided to the Plaintiff, and other Muslims, at Q-pod/Unit the Plaintiff submitted an inmate Request Form to the defendant(s) Unit Manager Captain Frey, Connecticut Department of Correction Religious Director Anthony J. Bruno, and Connecticut Department of Correction Commissioner Theresa Lantz addressing the violation(s), giving them notice, and making them aware of what was happening.

186. The defendants' Islamic Religious Advisor Abdul Majid Karim Hasan a student and follower of the late Warith D. Muhammad, the son of the founder of the Black Nationalist Organization known as "the Nation of Islam", did not and refused to advise on the essentiality of such Islamic essential events, unless he did not know of its essentiality. [redacted] J.B.V.

187. The Plaintiff is not a student nor a member of the organization and/or sect to which the defendant Abdul Majid Karim Hasan belongs.

188. Abdul Majid Karim Hasan belongs to a deviant sect.

189. Theresa Lantz, Anthony J. Bruno, Abdul Majid Karim Hasan, Mary M. Marcial, John Sieminski, Rene Keida, Captain Frey, and Other(s) were all notified and put on notice of all the existing violation(s).

190. On October of 2006 the Plaintiff was denied to attend the Eid-al-Fitr essential prayers and essential feast. The dependant(s) served the Plaintiff (and other Muslims) a regular "common fare" menu tray containing fish which has no religious significance toward the Eid-al-Fitr feast celebration.

191. The Plaintiff had no disqualification(s) to justify preventing him from attending the Eid-al-Fitr Salat (Congregational Essential Prayer) and the Essential Feast Celebration(s).

192. The Plaintiff was celled/housed at the MacDougall-Walker Correctional Institution's general population Q-pod/Unit.

193. The essential Eid-al-Fitr Feast celebration meal is the "Zabihah".

194. The "Zabihah" is an Islamic prescribed sacrificed animal's meat (Halal) from either a camel, cow, sheep, goat, etc.

195. "SACRICED ANIMAL SPECIFICATIONS
j14.2 Only camels, cattle, sheep, or goats may be Slaughtered. At the youngest, camels must be over five full years, cattle and goats over two full years, and sheep over one full year. A single camel or cow fulfills the sunna for seven (A: men and their families), though a shah (def: h2.5) only fulfills it for one. It is superior to slaughter a camel. The best animal to sacrifice is a camel, then a cow, then a sheep, then a goat. The best of shah (h 2.5) to slaughter is white, then tawny-colored, then black and white, and then a black one." [Reliance of The Traveller, A Classic Manual of Islamic Sacred Law, By: Nuh Ha Mim Keller; j14.2, page: 358].

196. A Shah means: either a one year old sheep (in its second year), or a two year old goat (in its third year).

197. "It is a necessary condition that a sacrificed animal be free of defects that diminish (A: the quality of) its meat. It is invalid to slaughter: ...". [Reliance of The Traveller, A Classic Manual of Islamic Sacred Law, By: Nuh Ha Mim Keller; j14.2, page: 358].

198. A Muslim, the Plaintiff, may have another Muslim slaughter the animal for him. It is best to slaughter the animal oneself. If unable to slaughter,

it is recommended to be present when it is done; however, not necessary.

199. It is recomended that a third of the animal sacrificed be eaten, a third be given away, and a third be given as charity (raw; not cooked).

200. It is obligatory to give away some of the meat as Charity, even if it is not much, and the hide is given in Charity or used.

201. It is not permissible to sell the hide or meat.

202. On or around November 2, 2006 the defendant Anthony J. Bruno wrote back to the Plaintiff rambling, then alleging ..."Your observation that the Native American inmates are allowed to go to the main building for smudging has no bearing on your situation ...".

203. There were no safety and/or security concern(s) to justify denying the Plaintiff (and other Muslims) an Eid-al-Fitr prayers and Feast celebration, as well as weekly essential Jumu ah(s).

204. On or around October 31, 2006 the Plaintiff filed a Line Grievance which was issued an IGP

No. 137-07-125, where the Plaintiff addressed/ complained about the denial of Islamic Friday Jumuah(s) weekly while at Q pod/Unit and the Plaintiff's exclusion/denial of the Eid-al-Fitr prayer(s) and Feast Celebration(s).

205. The defendant Anthony J. Bruno has and continues to misuse his authority as Connecticut Department of Correction's Religious Director. He has made and passed unofficial and unauthorized (by Connecticut General Statutes) rules designed to prevent Muslim(s) inmates, the Plaintiff, from free exercise of Religious beliefs and Religious exercise.

206. Defendant Anthony J. Bruno has cunningly violated the Connecticut Administrative Procedure Act in passing rules and regulation(s).

207. The defendant, Richard Blumenthal, is responsible for all or most of defendant Anthony J. Bruno's action(s) and the passing of rules and regulations of Constitutional conflict by giving them tacit approval(s).

208. The defendant(s), Anthony J. Bruno and others, have and continue to act with an overwhelming

amount of bias and bigotry towards the Islamic inmate Population, the Plaintiff, by denying Muslim(s) inmate(s) the ability to participate in Islamic (orthodox) essential acts of worship as prescribed by the Sharia (Islamic Religious Law), denying Muslim(s) inmate(s), the Plaintiff, the ability to pray and celebrate essential and main Islamic Holidays such as but not limited to Eid-al-Fitr, Eid-Ul-Adha, Days of Ashura, etc.

209. On November 13, 2006 the Plaintiff filed a Line Grievance which was issued IGP NO. 137-07-147, grieving the defendant's, Anthony J. Bruno and others, acts of bigotry, malice, bias, etc., in a Conspiratorial fashion toward the Muslim/Islamic inmate population, the Plaintiff, and the denial of another Eid-Ul-Adha and Eid-al-Fitr, by using in a Crafty Fashion an unannounced and unposted Religious Food Service Policy which may not have gone through the Process as demanded by the Connecticut Administrative Procedure Act, Connecticut General Statute(s) § 4-166 through § 4-189 and more.

210. On or around November 17, 2006 the defendant John Sieminski who is responsible for the operation(s) of his entrusted Facility (MacDougall-Walker Correctional Institution) after reviewing and investigating the facts

being grieved, Plaintiff's Line Grievance IGP No. 137-07-125, refused to correct the violation(s) happening and denied the Plaintiff's Line Grievance IGP No. 137-07-125; therefore, allowing the violation(s) to continue. The plaintiff appealed.

211. On December 14, 2006 defendant Wayne T. Choinski after investigating and reviewing the facts grieved by the Plaintiff in Line Grievance IGP No. 137-07-125 denied Plaintiff's Line Grievance. He checked-off the box where it states ..."This grievance may not be appealed to level 3 ..."; therefore, this Plaintiff has exhausted all his administrative remedies.

212. On December 18, 2006 the defendant(s) denied the Plaintiff's Line Grievance IGP No. 137-07-147. The Plaintiff appealed on December 19, 2006. On December 27, 2006 the defendant Wayne T. Choinski after review and investigation denied the Plaintiff's Line Grievance Appeal IGP No. 137-07-147. The defendant checked off the box where it states ..."This Grievance may not be appealed to Level 3 ..."; therefore, this Plaintiff has exhausted his administrative remedies.

213. Connecticut Department of Correction officers, the defendant(s), have created an innovated and

effective new way to issue retaliatory disciplinary infraction(s) for non-existing incident(s). The defendant(s) allege conspiracy and/or attempt to do something prohibitted by Code of Penal Discipline.

214. The conspiracy then extends to a finding of guilty by the hearing officer(s) with no evidence of guilt, nor that the allegation(s) even occurred.

215. The defendant(s) allege conspiracy and/or attempt to something that their perverted minds have created or thought and not something that did actually existed and/or occurred.

216. While the Plaintiff suffered the harm(s) cited and addressed above in Line Grievances IGP No. 137-07-125 and IGP No. 137-07-147 he was Celled at the MacDougall-Walker Correctional Institution's Q-pod/Unit compelled to double celling with inmate(s) Stepped down from Northern Correctional Institution a Super Maximum Correctional Facility. Furthermore, inmate(s) coming out of Northern Correctional Institution are known to suffer from some sort of mental health condition/disorders; Cell's toilets are programed to flush once every 15 (fifteen) minutes; Plaintiff and Cell-mate were compelled to eat inside the cell where the toilets flush once every

fifteen minutes yet eating tables are installed in the tier; The toilets are less than a yard away from the Plaintiff's head rest area of the bunk, and the bunk was designed in a way that's impossible to lay and sleep in another direction.

217. MacDougall-Walker Correctional Institution and other level 4 Facilities have policies prohibiting inmates, the Plaintiff, from exercising in the pod/unit indoor area.

218. The Plaintiff in MacDougall-Walker Correctional Institution's Q-pod/unit (and many other facilities) are/was not allowed and/or given an hour outside exercise per day, yet inmates at the RHU (Restrictive Housing Unit) and main building's general population inmates are given one hour outside exercise each day.

219. The MacDougall-Walker Correctional Institution's Q-pod/unit is a general Population unit yet is being operated under stricter conditions than the Punitive Segregation unit(s) at RHU (Restrictive Housing Units).

220. The Punitive Segregation Unit at MacDougall-Walker Correctional Institution are double celled yet have toilets with unrestricted flushes, running water, inmates receive an hour outdoor exercise each day,

and Islamic Chaplains, Rabbis, Reverands, etc., ussually tour the units to service inmates individually.

221. After the Plaintiff was exonorated of allegedly having an unauthorized Islamic male Silver Ring and/or having given false information the defendant(s), John Sieminski and others, did not want and outright refused to return the Plaintiff's Religious Islamic male silver Ring in violation of but not limited to the Connecticut Department of Correction Administrative Directive Policy.

222. On December 19, 2006 the Plaintiff filed a Line Grievance IGP No. 137-07-180 in attempt to have his Religious and very Sacred Islamic male Silver Ring.

223. Inmate(s) throughout the entire Connecticut Department of Correction and its Facilities are allowed (authorized) to have and wear expensive rings (wedding bands) and other items of Jewelry such as Chains with huge crosses and/or medallions.

224. The Plaintiff made the fact known to the defendant(s), John Sieminski and others, that the only acceptable piece of jewelry in accordance

with the Plaintiff's Islamic Sunnah (orthodox) beliefs and practice is a male Silver Ring.

225. On January 5, 2007 defendant John Sieminski denied the Plaintiff's Line Grievance IGP No. 137-07-180 then alleged falsely that the Plaintiff's Islamic Silver Ring was unauthorized.

226. The Plaintiff had been cleared of having given false information through the Disciplinary process and of having unauthorized item, that being the Plaintiff's Islamic Silver Ring.

227. On January 5, 2007 the defendant John Sieminski assured the Plaintiff that the Ring would be stored while the Plaintiff remained at MacDougall-Walker Correctional Institution. The Plaintiff appealed.

228. The Plaintiff has known medical complications. These complications are known to the defendants, as reflected in the Plaintiff's medical file.

229. The Plaintiff's medical complications are due to mid and lower back complications, a slipped disc, hips, knees, legs, and feet medical conditions which causes the Plaintiff excruciating pains.

230. At times, verry often, the Plaintiff's left leg goes numb even while the Plaintiff walks. The level of pain the Plaintiff is/has been excruciating. Yet the defendant(s) have and are: (A) Delaying and/or denying access to medical attention; (B) Denied access to medical personnel qualified to exercise judgment about the Plaintiff's medical problems; (C) Failed or refused to inquire into essential facts that are necessary to make a professional judgment; (d) Interfered with medical judgment by non-medical factors; (E) Refused to provide the Plaintiff prescribed Medication for known and diagnosed chronic back, hips, legs, and feet pain.

231. On January 23, 2007 the Plaintiff made a Medical Request due to the Plaintiff's medical needs which was responded by scheduling an appointment.

232. Due to the Plaintiff's Medical conditions defendant John Sieminski authorized a chair in cell.

233. On February 5, 2007 the defendant Wayne T. Choinski after reviewing and investigating the facts behind the authorization and confiscation of the Plaintiff's Islamic male Silver Ring as addressed in Line Grievance Appeal IGP No. 137-07-180 denied the Plaintiff's Line Grievance Appeal. The Plaintiff has

exhausted his Administrative Remedies.

234. On April 20, 2007 the Plaintiff filed a Health Grievance IGP No. M137-07-114 due to the defendant(s) out right disregard and/or out right refusal to treat the Plaintiff's Medical Condition(s) that causes the Plaintiff to suffer excruciating pain day and night.

235. The defendant(s) never informed the Plaintiff that he suffers from a slipped disk. The Plaintiff became aware after reading information on Medical file.

236. Defendant(s) denied Doctor Silvis's prescribed MRI. Upon being informed on or around March 27, 2007 the Plaintiff expressed wanting to appeal the decision to the new practitioner [?] who assured the Plaintiff he checked-off the box to appeal.

237. Due to the Plaintiff's Medical condition(s) and complications the Plaintiff requires special Medical treatment, an MRI, Chronic Pain Medication, Single cell status in the general population, a theropedic mattress, bottom bunk status, back brace, a walking cane, special shoes - sneakers - and work boots, all of which the defendant(s) have totally and deliberately refused to provide while giving preferential treatment to other inmates, i.e. whites and those who are Politically connected, and those who are wealthy.

238. The defendant(s) are denying the Plaintiff required and prescribed medical treatment due to discriminatory motives. The plaintiff is of an identifiable Class, Hispanic/Latino/Puerto Rican, indigent, underprivileged, under represented, and a Muslim of the Islamic Way of life.

239. The Plaintiff discovered that during the time-frame of the Plaintiff's arrest, investigation that lead to the Plaintiff's arrest, being charged, appointment of legal representation, pre-trial representation(s) and investigation(s), Judicial District judge assigned to the Plaintiff's criminal Case for trial, trial, jury selection, prosecutor's accusations against the (defendant) Plaintiff, the ineffective representation of defense counsel, Conviction, sentence - its length of time, appeals, habeas corpus petition(s) and its legal defense(s) representation(s), Sentence review board's findings, all post conviction remedies, place of incarceration within the Connecticut Department of Correction, and Classification(s) by the defendants, discrimination against the plaintiff was/is the major factor towards its negative and unequal outcome.

240. The Plaintiff discovered that the defendant(s), the State of Connecticut and its Governor

-ds by classifying an overwhelming amount
ipanics/Latinos (the Plaintiff) as whites in
ot to hide the level(s) of Racial disparity.

The defendant(s) action(s) and/or failure
resulted in the following manners affecting
aintiff, Hispanics/Latinos and African-
ans:

a. Public Defenders Office for the State of Connecticut was and/or is under staffed;
b. Are assigned excessive amount of case-loads per public defender and Special Public Defender;
c. Were/are governed by inadequate policies and procedures;
d. Were/are unequipt and/or underequipt with old outdated computers and/or computer softwear;
e. Were/are trying to perform their duties in a disheveled office work enviremment;
f. Were/are highly underpaid (Public Defenders and Special Public Defenders);
g. And other systematic deficiencies;

made it unlikelly, or nearly impossible, for
system's clients/subjects, Hispanic/Latinos
African Americans (the Plaintiff), to receive

ge that:
state of
um, Judicial
the State
: Department(s),
ll its
tate of
n. It's
er(s),
id,
State of
and,
the State
orrection(s);
ny of
d/or
id official(s)
continue
cs/Latinos
s at an

Constitutionally and Statutorilly adequate legal representation in Criminal procedings.

247. Public Defenders and Special Public Defenders were and are unsupervised and/or evaluated, unqualified and without adequate training.

248. Public Defenders and Special Public Defenders were and possibly still are assigned to handle approximately 1,500 cases per year, an average of 125 cases per month. Leading to inadequate legal representation, poor case management, little amount of time towards legal research, high levels of Stress and alot more, all harming Hispanics/ Latinos (the Plaintiff) and African Americans who mostly rely on the Services of the Public Defenders due to Low income, poor.

249. Public Defenders and Special Public Defenders were and possibly Still are under Staffed without adequate number of paralegals, investigators, expert witnesses of all levels and professions, etc.

250. The State of Connecticut prosecutor's Office's budget were/are unlimited while the Public Defenders' and Special Public Defenders' budget were/are Strained, under budgeted, deprived, and

and insuficient.

251. Special Public Defenders and Public Defenders (the Plaintiff's defense attornies) due to the financial constraint(s), overloaded case loads, under staffed, underpaid, over worked, and without adequate office equiptment (computors, software, etc.) failed to adequately represent the Plaintiff a member of an identifiable Class (Latinos/Hispanics and African Americans), and/or present exculpatory evidense, and/or mitigating evidence, etc.

252. Within the United States of America the State of Connecticut ranks number one (#1) in levels of Racial Disparity in rates of incarceration and length of sentences of whites verses Hispanics/Latinos (the plaintiff) and African Americans. Information known to the defendant(s) for over a decade without any action done, while the harm(s) continue to increase overwhelmingly.

253. State of Connecticut Governor(s), named defendants, and others knew about this crisis yet have not done anything to attempt to cure/fix the problems and/or harms done and being done.

254. The defendant(s) continue to make Laws

in the State of Connecticut that harm(s) the suspect Class, Hispanics/Latinos and African Americans, being affected by the racial disparity to a much much wurst degree than whites. The defendant(s) guise these Laws under the guise of getting tough on crime.

255. On or around September of 2005 the defendant Governor M. Jodi Rell went on the record as having been startled by the news and allegedly heartbroken by the pervasive racial and ethnic disparity that has plagued the State of Connecticut's Criminal Justice System, yet has done nothing to improve the criminal Justice System in the State of Connecticut. The problems of racial and ethnic disparity, discrimination, Continues to ever wursen.

256. The defendant Governor M. Jodi Rell Claimed to have called for a new resolve in the Campaign to eradicate this ever-worsening Condition. Yet, the same problem causing Judges, prosecutors, Public Defenders, and Special Public Defenders, Police officers, etc., are in office and job post doing what they have been doing for decades against members of an identifiable Class Hispanics/Latinos and African Americans, the Plaintiff.

257. Nothing has been done to eradicate the State of Connecticut's, defendants', harm(s) done against the Plaintiff and other victims of but not limmitted to racial and ethnic disparity, Judicial Failure, etc., all violations of which this Great Nation has taken a firm stand against when it exists in other Countries. The defendant(s)' actions are in violation of but not limited to the Constitution of The United States of America, and other Federal Laws, Acts, etc., cited in the body of this complaint.

258. On or around December of 1997 State representative Ms. Edna Garcia appeared in Court in attempt to persuade the Plaintiff's trial judge to delay the trial due to the very facts, but not limited to, itemized in this complaint, yet she was highly criticized by members of the Court, and news reporters, and the defendant(s). The defendant(s) opened a new campaign of retaliation against the Plaintiff and made, and publicized through the media slandering, libel, and untrue allegations that the Plaintiff was a member of a nortorious Street gang.

259. On or around March of 2007 the Plaintiff filed a State Habeas Corpus Petition claiming

the above State of Connecticut's racial disparity and its failure to adequately provide the Petitioner/ Plaintiff adequate legal representation, a fair trial, and a jury of the Petitioner's peer(s).

260. On or around May of 2007 the State of Connecticut Superior Court, Judicial District of Tolland, at Rockville, Connecticut granted the petitioner's/ Plaintiff's application of waiver of fees and issued a docket number to the Habeas Corpus Petition, CV07-4001706S.

261. On May of 2007 the Rockville Superior Court's Judge, J. Fuger, declined and returned the Plaintiff's/ Petitioner's State Habeas Corpus Petition.

262. On or around May 24, 2007 the Plaintiff filed a Notice of Appeal and Application For Waiver of fees, costs, and Expenses and Appointment of Counsel on Appeal, which were both rejected by the Rockville Court Judge J. Fuger and mailed back to the Petitioner/ Plaintiff.

263. The Plaintiff made several attempts to have the appeal documents to go through and be filed

but the Court continued sending them back to the petitioner/Plaintiff.

264. After Judge's J. Fuger declined and returned the Plaintiff's Habeas Corpus Petition and the Appeal Notice and other related documents the Petitioner/Plaintiff called the State of Connecticut Habeas Corpus Unit seeking legal assistance on the Habeas Corpus Petition matter and left a message.

265. Ms. Adele V. Patterson from the State of Connecticut Habeas Corpus Unit returned the Plaintiff's telephone call and advised the Plaintiff.

266. It was later discovered that the Judge who tried and sentenced the Plaintiff was a State Prosecutor. He is/was known to have been stern against Hispanics/Latinos and African Americans giving us/them much longer sentences while being lenient on whites and giving them lighter sentences, parole, probation, programs, lighter prison time, etc.

267. During the Plaintiff's criminal State trial there was alot of non-verbal Communication going on between the Sherriffs,

prosecutor, defense Counsel, and judge in the sight of the Plaintiff and jurrors. Communication which was not recorded to the best of the Plaintiff's beliefs. The communication being done in front of the jurror(s) was not good, and coaching to the prosecutor. The prosecutor through non-verbal communication coached and/or lead the State's witnesses.

268. During the coarse of the Plaintiff's trial unnecessarily and without just cause there was an overwhelming amount of visible Court marshals, approximately one feet away from the Plaintiff, surrounding the Plaintiff as extra security obviously sends signals to the jurrors that the accused (the Plaintiff) was/is dangerous and/or may erupt in the court room and/or assault someone.

269. Classification of skin color, culture, and Race has been used as a tool to discriminate.

270. Dark skin may be associated, by the defendant(s), with frizzy or kinky hair or Curly or wavy straight hair. These factors used by the defendant(s) establishes lines of division among biological populations both

arbitrarily and subjectively.

271. Race, Culture, and skin color was a destructive mechanism used in the United States of America during the 18th Century to classify populations: the English and other Anglo Saxon European cultures conquered Native Americans, and enslaved peoples of Color, i.e. Africans, Puerto Ricans, and other peoples of color from the Carabeean Islands.

272. Race, Culture, and skin color is being used as a mode of classification subsuming the defendants' ideology of inequality devised to rationalize white European attitudes and treatment of the Hispanic/Latino and African-American population (the Plaintiff), the same destructive mechanism used to justify the retention of slavery.

273. The defendant(s) have established a rigid White hierarchy of socially exclusive categories, and underscored and bolstered unequal rank and status differences amongst Hispanics/Latinos and African Americans (the Plaintiff) to justify their disparity.

274. A study of the quality of legal representation, Judicial due process, Pre-Sentence investigations, and sentences of Hispanics/Latinos and African Americans verses that provided to whites in the State of Connecticut will conclusively reveal these facts.

275. The defendant(s) used/use the difference(s) of the Plaintiff's physical traits, Hispanic/Latino and African American, as a marker or symbol(s) of status differences.

276. Race, Culture, and skin color is being used as a mode of classification subsuming the defendants' ideology of inequality devised to rationalize white European attitudes and treatment upon Hispanics/Latinos and African Americans (the Plaintiff) population. The same destructive mechanism used to justify the retention of slavery.

277. The defendants' actions are the same traits of the Nazis' under Adolf Hitler who enjoined the ideology of "race" and "racial" differences taking them to a logical end, to them. Instituting "inferior races" to consentration camps, detention centers, prisons, ghettos, etc., and exterminating approximately

Eleven Million people (Jews), and committing other unspeakable brutalities of the Holocaust.

278. Ex-Governor of Connecticut John Rowland did away with "good-time" earnings for State of Connecticut Prisoners and built more prisons filling them with mostly Hispanics/Latinos and African Americans. Yet, when John Rowland violated Federal Law(s) and State of Connecticut Statutory Laws he was not prosecuted to the fullest extent under the Law as what was and is still being done against Hispanics/Latinos and African Americans.

279. Hispanics/Latinos and African Americans are minorities in the State of Connecticut. Together they make-up less than 33% of the total population in the State of Connecticut, yet make-up the largest race, culture, ethnic groups in the State of Connecticut Department of Correction serving the most severest of sentences, also another level of Racial desparity within it self. My God! My God! My God! How long will this continue to go overlooked?

280. On May 8, 2007 the defendant(s) or some employee under the defendant's supervision, rejected the Plaintiff's Medical Grievance IGP No. M137-07-114 totally disregarding and refusing to give the Plaintiff the Medical treatment needed for the Plaintiff's very serious Medical Condition(s)/injuries.

281. On May 10, 2007 the Plaintiff appealed defendant(s)' May 8, 2007 rejection to treat the Plaintiff's Medical conditions/injuries as addressed in Medical Line Grievance IGP No. M137-07-114.

282. The defendant(s) never mailed nor issued the Plaintiff an actual form or letter of notification. Nor did the defendant(s) issue the Plaintiff a form or letter with which the Plaintiff could have written and submit an appeal, rather the Plaintiff had to state his desire to appeal verbally to the new practitioner and trust the practitioner would fill and file the appeal.

283. The Plaintiff needs specialised Medical Treatment for his back, hips, knees, and feet; furthermore, for the traumatic stress caused by

the above mentioned assault.

284. On or around May 17, 2007 the Plaintiff found-out that defendant Rene Keida, the MacDougall-Walker Correctional Institution's Religious Coordinator, retaliated, conspired, and orchestrated a guilty finding on Disciplinary Report(s) M-W C.I. 0609058 and M-W C.I. 0609065 mentioned above, due to retaliatory and discriminatory motives, because of the Plaintiff's Islamic Faith and because the Plaintiff's Civil Rights Action, Joe Burgos Vega v. Theresa Lantz, et al., 3:04CV1215 (DFM), and because the plaintiff's filings of many Live Grievances complaining about many violation(s) of the Plaintiff's (and other Muslims') Constitutional Rights, Connecticut State Constitution, Connecticut General Statutes, and the (RLUIPA) 42 U.S.C. §2000cc-1, 2, 3, 4, 5, 6, and 7.

285. Defendant Rene Keida faxed a cover sheet to defendant Anthony J. Bruno in which he typed/wrote ..."Should not avoid discipline"..."Decision"... "Class ... action" ..."Bruno - See attached Joe Vega is still here - They never transferred Him - This is what we could have Avoided - By sending him to Cheshire - Then after Q He will Be Sent

To other Expansion Units- where there is Less-For Service" ... " Regards- Rene".

286. Defendant Rene Keida furthered his retaliatory conspiratorial action(s) by having Connecticut Department of Correction correctional officer(s) specifically single-out the Plaintiff and make recorded entries, writings, transcription(s), note(s), information, etc., on Connecticut Department of Correction records, and believed to have been relayed to various United States Government Agency(ies)/Department(s).

287. Rene Keida have lied against the Plaintiff and made various false allegation(s) to Government Agencies/Department(s).

288. On becoming aware of the retaliatory and conspiratorial action(s) of defendant Rene Keida and other(s), along with his action(s) of reducing dramatically Islamic Service(s) hour(s), separating the Islamic inmate populations' collective essential worship and service(s), and the fact that during the months of October through December of 2006 approximately 20 to 30 Muslim inmate(s) were abusively and discriminately singled out and placed in the MacDougall-Walker Correctional Institution's RHU (Administrative Segregation/Dentention)

for an overwhelming amount of days based on the defendant(s)' orchestrated and retaliatory action(s), on or around May 17, 2007 the Plaintiff submitted an "Administrative Hearing Request" to Warden Peter Murphy, pursuant to Connecticut General Statute(s) § 4-168 and § 18-78a, "Applicability of the Connecticut Administrative Procedure Act" to the Connecticut Department of Correction.

289. On May 22, 2007 the defendant Richard Furey denied the Plaintiff's Medical Line Grievance Appeal IGP No. M137-07-114, and checked off the box where it states..."This grievance may not be appealed to Level 3..."; therefore, the Plaintiff has exhausted his administrative Remedies.

290. On May 25, 2007 defendant Peter Murphy replied to Plaintiff's May 17, 2007 administrative hearing request. He denied the Administrative Hearing Request and forwarded it to the Attorney General's office for review and response.

291. The Attorney General, Richard Blumenthal, gave the defendant(s), Theresa Lantz and all other(s), tacit approval for their action(s) against the Plaintiff (and other Muslims).

292. On August 1, 2007 the Plaintiff filed a line grievance IGP No. 137-07-027 regarding defendan(s)' Conspiratorial and retaliatorial actions against Islamic Faith inmates at MacDougall-Walker Correctional Institution (Plaintiff), and Islamic Chaplain(s) who did not and would not share nor accept the same beliefs, opinions, views, interpretations, etc., as defendant Abdul Majid Karim Hasan who adheres to deviant beliefs, opinions, views, and interpretations.

293. Defendant Abdul Majid Karim Hasan is a member of a deviant Heretical sect and/or cult.

294. After the filing(s) of Line Grievance(s) where the Plaintiff addressed the defendants' conspiratorial and retaliatorial orchestrated actions against Muslims of the Islamic Faith (the Plaintiff and other Muslims), defendant Captain Beaudry and other(s) would enter Islamic Taleems (study classes) and the Friday Jumuáh essential Congregational prayer service with dogs and a great number of other correctional officers harasing, intimidating, threatning the Islamic Faith Muslim inmate(s) (the Plaintiff and others). The defendant(s)' Facial expressions were and reflected extreme hate. Looks does communicate.

295. The defendant(s), Rene Keida, Anthony J. Bruno, Theresa Lantz, Peter Murphy, and others in the Complaint, reduced Islamic Services by an overwhelming amount, not only at MacDougall-Walker Correctional Institution but throughout the entire Connecticut Department of Correction out of retaliation for the filing of action Joe Burgos Vega v. Theresa Lantz, et al. Civil No. 3:04CV1215 (DFM), while increasing Christian services and other non-Islamic Religion's activities and services overwhelmingly.

296. The defendant(s) refused to allow good reputable Islamic volunteers, even those provided by the Hartford, Connecticut Semanary free of Charge to the Connecticut Department of Correction.

297. The Islamic (Imam) Headmaster at the Hartford Semanary offered the defendant(s), Theresa Lantz and others, free service(s) for all Islamic related service(s) ranging from Jumuah, Congregational Salat - five daily essential Congregational Prayers, Taleems, Feasts, Muslims' Religious diet inspection(s), and much more.

298. The defendant(s) have tacitly denied the above mentioned offer, selfishly not considering

that our Country is in a recession, the economy is very bad, and the offer made by the Hartford Semanary's Islamic Headmaster is generous and will save the State of Connecticut large amounts of money while providing the Plaintiff (and all other Muslims) essential Islamic Service(s) without Civil Rights violations nor Constitutional Rights Violations.

299. At present the defendant(s) have only less than Five (5) Islamic volunteer(s), while having over 150 volunteers of the Christian Faith.

300. The defendant(s) arranged to hire non-Islamic Full-time Christian Chaplains, Christian Coordinators, Christian supervisors, Christian correctional officers, Christian Wardens, Christian deputy Commissioners, and Christian Commissioners, while denying Islamic Faith employee(s) the opportunity to occupy and excercise those same position(s) when vacant. The defendant(s)' action(s) reflects a Religious desparity from the bottom all the way up.

301. On or around August 10, 2007 the Plaintiff Sensed a bad odor and saw filth on the MacDougall Walker Correctional Institution's Islamic Service(s)' Prayer rug and addressed it to the defendant(s).

302. The Plaintiff requested that the defendant(s) Clean and vacume, and Spray or Sprinkle perfume on the multy purpose room's Islamic Service(s) Prayer rugs, and that the Connecticut Department of Correction's Commissary (the defendants cited on the Amended complaint) make airfreshners available for inmate purchase and/or allow Muslims (the Plaintiff) to burn incense as it is a part of the essential practices of the Sunnah, the Plaintiff's Islamic Faith, beliefs, and Practices.

303. Plaintiff's reason(s) for request to burn insence or have air-freshner(s) in cell is due to the fact that Muslims are essentially required to have the area of prayer(s) perfumed, clean, and well organized. In the prison(s), Connecticut Department of Correction, the Plaintiff (and other Muslims) have to put up with double celling, dirty unsanitary cells and Prison conditions, Stinking cell-mate's clothes, sneakers, etc.

304. The defendant(s) allow Correctional official(s) to have at their Stations, offices, etc., air-freshners. And, allow Native Americans to burn insence and/or tabaco, while denying Muslims (the Plaintiff) equal opportunities to practice his/their Islamic Religion to burn incense and/or have air-freshner(s) and/or Spray or sprinkle perfume on the prayer Rugs (Personal and Communal).

305. On August 15, 2007 defendant Peter Murphy after investigating, becoming aware of the facts, and knowing of the complained of violation(s) denied the Plaintiff's Line Grievance IGP No. 137-08-027. The Plaintiff appealed.

306. On or around August 20, 2007 the Plaintiff discovered that the defendant(s) cited in this Amended Complaint categorized and sold Commissary item(s) # 673 and # 674 (Jolly Ranchers and Starlite mints) as "Halal" (Islamically Approved) misleading the Plaintiff (and other Muslims) causing the Plaintiff to eat Candy(ies) which were not Halal, in violation of the Plaintiff's Islamic Essential dietary prescribed Laws.

307. The defendant(s) falsely advertized Commissary items # 673 and # 674 as Halal, Islamically Approved Certified items, while they were actually "Haram", i.e. Islamically Forbidden/disapproved items, misleading the Plaintiff (and other Muslims) causing him to eat these items (# 673 and # 674) for over a year believing they were Halal.

308. The Plaintiff (and other Muslims) was lied to and mislead by the defendant(s).

309. Commissary items # 673 and 674 (Jolly Ranchers

and Starlite Mints) were very popular Commissary items within the Connecticut Department of Correction's Islamic Prison Community.

310. The Plaintiff discovered the above mentioned facts pertaining to Commissary items # 673 and # 674 after reading a book by the "Muslim Consumer Group For Food Products". About the author, he is Syed Rasheeduddin Ahmed M. Sc. (AG), M.S. Former Senior Research Scientist II, Kraft Foods U.S.A., Inc.

311. On August 20, 2007 the Plaintiff filed a line grievance IGP No. 137-08-043 notifying and complaining about the defendant(s)' actions, their false advertizement and their fault for causing the Plaintiff (and other Muslims) to consume "Haram" (Islamically Forbiden) food/candy(ies) Commissary item(s) # 673 and # 674.

312. On August 22, 2007 the defendant, Peter Murphy, rejected the Plaintiff's Line Grievance IGP No. 137-08-043. The Plaintiff appealed.

313. On August 20, 2007 defendant, Rene Keida, responded to the Plaintiff's August 10, 2007 inmate request and claimed to have addressed

the problem with the Islamic Prayer rug at the Multy purpose room being dirty and stinking; however, did not respond to the Plaintiff's request for either burning Islamic Incense or allow the Plaintiff to purchase air-freshners and/or perfume for the in-cell prayer(s).

314. It is an Islamic central act and obligation for Muslim(s) to maintain his/her place(s) of Salat (Prayers) clean and cented with perfume... "758. A'isha (R.a.a.) is reported to have said that Allah's Messenger (s.a.w.s.) commanded that places of worship should be set aside in the houses and they should be cleaned and sprayed with perfume." [Sunan Ibn Majah, Volume 1, Hadith # 758].

315. The "places of worship" mentioned in the above Hadith # 758 is essentially meant but not limited for Sunnah prayers, same applies to congregat-ional places of worship.

316. During a deposition on the matter of Joe Burgos Vega v. Theresa Lantz, et al. 3:04CV1215 (DFM) defendant(s) disclosed the fact that they knew about the cheese being served in the Common Fare, which is suppose to accomodate Religious Dietary Scrupples, was/is not Halal

(Islamically approved), nor Kosher certified, as it was suppose to be Kosher Certified, but it was not. The defendant(s) after knowing that the cheese was not Halal nor Kosher certified deliberately and maliciously continued serving the non-Halal and/or non-Kosher cheese violating the Plaintiff's (and other Muslims') Constitutional Rights, but also violated the Plaintiff's (and other Muslims') trust.

317. The Plaintiff further confirmed the accuracy of the non-Halal/Kosher certified cheese by obtaining a copy of the cheese wrapper; which confirmed it not to be Halal/Kosher certified.

318. All Connecticut Department of Correction's Common Fare Food Serving items are suppose to be "Kosher Certified and Islamically Acceptable" according to policy, but they have been proven not to be.

319. The defendant(s) knowing the Plaintiff's Medical condition discontinued giving/providing pain medication to the Plaintiff for over six (6) months causing the Plaintiff to suffer excruciating and unimaginable ammount of pain, Sleeplessness, etc. The plaintiff reminded the defendants by Inmate Request Forms and

Inmate Line Grievances and in person but the defendant(s), Richard Furey, doctor Silvis, etc., Continued disregarding the Plaintiff's need(s) toward pain medication.

320. On August 27, 2007 the Plaintiff filed a Line Grievance IGP No. 137-08-052 due to the deplorable, dirty, and foul smelling condition(s) at the Muslim(s)', the plaintiff's, place of Congregational worship, the prayer rugs, the plaintiff's cell, etc., as cited above.

321. On September 4, 2007 the defendant Peter Murphy rejected the Plaintiff's Line Grievance IGP No. 137-08-049 and allowed the Continued Serving on non-Halal/Kosher certified cheese on the Commonfare Menu Meals, in violation of the Plaintiff's Islamic Religious Beliefs. The Plaintiff appealed.

322. Defendant Peter Murphy claimed that the issue with the cheese was under litigation by the Plaintiff; however, the plaintiff made it very clear that the situation with the cheese was not under litigation because it was just discovered on or around August 24, 2007 after the action of Vega v. Lantz, et al., 3:04CV1215 (DFM) was filed.

323. On September 4, 2007 the defendant Peter Murphy rejected the Plaintiff's Line Grievance IGP No. 137-08-052 allowing the deplorable, dirty, and foul smelling condition(s) complained about to continue. The Plaintiff appealed.

324. On September 28, 2007 defendant, Wayne T. Choinski, after being informed, investigating, and reviewing the complained about condition(s) denied the Plaintiff's Line Grievance IGP No. 137-08-027 appeal. He checked off the box where it states "... this grievance may not be appealed to level 3 ..."; therefore, the Plaintiff has exhausted his administrative remedies.

325. On or around October 10, 2007 the Plaintiff discovered that the defendant(s) were and continue to charge Connecticut Department of Correction Prisoners, the Plaintiff, an extreme excessive 30% mark-up to prices in addition to 6% Connecticut State Sales Tax. And, intend to deduct an additional 10% deduction to deposit(s) into an inmate's account until it reaches $1,000.00 (One Thousand Dollars), thereafter, all 10% deductions are for the State of Connecticut as restitution payment(s), totalling deduction(s) to a minimum of 46%.

326. The Plaintiff was not sentenced to pay restitution as part of his sentence.

327. The defendant(s)' extremly excessive 30% mark-up prices are for Free World standards where Citizen(s) are paid ranging from minimum wage(s) on up, and not meant for the incarcerated, the Plaintiff.

328. The Plaintiff, and many other inmates, relly upon gifts in the form of money orders from family and/or friends to purchase Connecticut Department of Correction's Commissary item(s) at excessive price(s) because the defendant(s) have monopolized through Connecticut Department of Correction Policy(ies) for all inmate(s), the Plaintiff, to purchase from Connecticut Department of Correction Commissary only.

329. Thereafter, the defendant(s) reduced inmate(s), the Plaintiff's, State wages all the way down to 0.75 ¢ per day for hard labor, while steadily and continiously increasing the price(s) of commissary items.

330. For certain items inmate(s), the Plaintiff, is expected to pay over 100%, 200%, and even 300% over competitive retail prices.

For example, when the Plaintiff was not incarcerated, the Plaintiff assisted at his cousin's grocery store "El Coqui Grocery Store", where the same identical cookies as Connecticut Department of Correction's Commissary item(s) #767 Strawberry cookies and item # 748 Peanut Butter Cookies, both Halal certified, were being sold at (2) two packs for $1.00 or a single pack at 0.50 ¢. However, the defendant(s) are selling the same identical cookies at a price of $1.33 for one (1) single pack.

331. The defendant(s) have sold, and possibly continue to sell, the Plaintiff (and other inmates) refurbished electronic items at high retail prices as mentioned above.

332. On October 15, 2007 the defendant(s), Wayne T. Choinski and others, after being informed, investigating, and reviewing the complained about situation denied the Plaintiff's Line Grievance Appeal IGP No. 137-08-043. He checked off the box where it states "... This grievance may not be appealed to level 3 ..."; therefore, the Plaintiff has exhausted his administrative remedies.

333. On October 16, 2007 the defendant(s), Wayne T. Choinski and others, after being informed,

investigating, and reviewing the complained about deplorable situation of Religious significance, denied the Plaintiff's Line Grievance Appeal IGP NO. 137-68-052. He checked off the box where it states "... This grievance may not be appealed to level 3 ..."; therefore, the Plaintiff has exhausted his Administrative remedies.

334. On October 17, 2007 the Plaintiff had to request for a pain medication refill again. The defendant(s) respond was "... you dont have an order for pain medication, please sign up for sick call." This type of deliberate denial and negligence is caused by the Connecticut Department of Correction's, the defendant(s), implimented policy to charge $3.00 for every sick-call scheduled appointment.

335. On October 18, 2007 the Plaintiff filed a medical line Grievance IGP NO. 137-29-278 because although the Plaintiff followed instructions and submitted a sick-call request, the defendant(s) were not calling the plaintiff to medical.

336. On or around October 19, 2007 the Plaintiff received a Medical Line Grievance IGP No. 137-29-278 denial. The Plaintiff appealed.

337. On October 25, 2007 the defendant, Medical Supervisor Richard Furey, denied the Plaintiff's Medical Line Grievance Appeal IGP No. 137-29-278. He checked off the box where it states "... This grievance may not be appealed to Level 3 ..."; therefore, the Plaintiff has exhausted his administrative remedies.

338. On October 31, 2007 the defendants, Wayne T. Choinski and others, after being informed, investigating, and reviewing the complained about situation of essential Religious significance denied the plaintiff's Line Grievance Appeal IGP No. 137-08-049. He checked off the box where it states "... This grievance may not be appealed to Level 3 ..."; therefore, the Plaintiff has exhausted his administrative remedies.

339. On November 16, 2007 the Plaintiff filed a Line Grievance IGP No. 137-08-156 where the Plaintiff grieved:

a. The extremely excessive 30% mark-up to all Connecticut Department of Correction Commissary items; and,

b. The additional 6% Connecticut State Sales Tax to Connecticut Department of Correction Commissary items; and,

c. Public Act 07-158, 10% deduction(s) from any entries of currency set

aside into a savings account up to a limit of $1,000.00, without collecting interest, and paying restitution. When restitution payment(s) were not part of the Plaintiff's (and Many other Prisoners) sentence; and,

d. The total ban on rap music containing what the defendant(s) arbitrarily and discriminately consider objectionable forms of expression. The defendant(s) are descriminately singling-out a class of identifiable group of people, the plaintiff (and others), Hispanics/Latinos and African Americans and others.

340. On December 3, 2007 the defendant(s), Peter Murphy and others, after reviewing, investigating, and knowing of the complained about Constitutional violation(s) as itemized by the Plaintiff in Line Grievance IGP No. 137-08-156, denied the Plaintiff's Line Grievance. The Plaintiff appealed.

341. On December 4, 2007 defendant Anthony J. Bruno responds to Plaintiff's request for authorization/Approval to purchase Islamic Religious CD's discriminately denying the Plaintiff approval. This defendant also based his reply as a form of retaliation because the Plaintiff's

Civil Rights Action, Joe Burgos Vega v. Theresa Lantz, et al., 3:04CV1215 (DFM) where he is a defendant.

342. The Connecticut Department of Correction, the defendants cited in the Caption, has a contract with "Music by Mail" who sells a large variety of Music and non-Music CD'S, and Cassette tapes. They include Rock, Comedy, Soul and (Rap) Hip Hop - Special Connecticut Department of Correction Edition of Deletions on certain forms of expressions, Dance, Country, Blues, Jazz, Oldies, New Age, Gospel, Christian, Classical, Sound Tracks, Vocals, World Music, Language(s), Reggae, Latin, Relaxation and Nature, and much more.

343. The defendant(s), Anthony J. Bruno and Others, while giving access to Christian Faith and Native American inmate(s) to purchase Religious and non-Religious CD'S and audio cassette tapes descriminately and in a retaliatory fashion denied the Plaintiff authorization/approval to purchase Islamic Religious Educational CD'S through good reputable Islamic Vendors from which the Plaintiff has purchased all of his Volume(s) of Islamic literature never having and/or causing any form of security concern(s).

344. Attorney General Richard Blumenthal have and continued to give the defendants' discriminate and retaliatory action(s) tacit approvals, as defined by Connecticut General Statute § 4-169 (a), (b), and (c).

345. On December 16, 2007 the Plaintiff respectfully advised the defendant(s), (after discussing the issue over with Plaintiff's attorney), that any new issue or request(s) are new and may become new issues which may require Judicial review. And made it known that the Plaintiff always look forward to resolving these issues rather than occupying the Courts' time with issues that could be or have been resolved in the administrative level.

346. On December 19, 2007 the Plaintiff (and other Muslims at MacDougall-Walker Correctional Institution) was surprised with unanounced news that it was the 10th day of the Islamic Calendar Month of Zul-Hijji, which is the day of the Second (2nd) most Essential Islamic Holiday known as Eid-Ul-Adha (The Day of the Sacrifice), where an essential sacrifice is done, before true noon,

along with the essential congregational Salat (Prayer), then Muslims Feast.

347. The Islamic essential meal of the Eid-Ul-Adha is the "meat" of the Sacrificed animal, as described in detail above, see paragraphs# 193. through 201.

348. The defendant(s) do not inform Muslim(s), the Plaintiff, the Islamic Calendar dates in order for the Muslims, the Plaintiff, to keep track of the Islamic dates, months, Holidays, etc., although the Plaintiff (and other Muslims) have made and continue to make many requests.

349. On December 19, 2007 the defendant(s) served the Muslims, the Plaintiff, breaded fish for the Eid-Ul-Adha Feast, a serving having no Islamic Religious significance.

350. On December 19, 2007 the defendant(s), cited in the caption, denied the Plaintiff (and other Muslims) an essential Eid-Ul-Adha Feast and/or its main serving.

351. It is known to the defendant(s) that the Islamic Community at Large in the State of Connecticut and abroad are willing to

donate Halal Certified Foods for the Plaintiff's (and all other Muslims') Islamic Essential Holidays as was being done prior to the filing of the events itemized in this Amended Complaint.

352. The Plaintiff even suggested establishing an "Incarcerrated Muslim" Trust Fund to possibly help alleviate costs, if cost(s) is a concern. Where Muslims, Muslims' Families, Mosque leaders, Friends, etc., may send money/money orders. And, Muslims, the Plaintiff, (and other Muslims) is/are willing to pay Sadaqa/Zakat (2.5% Islamic Essential Charity for the Communial Affairs) for the operation(s) of the Islamic Community within the Connecticut Department of Corrections. However, none of the proposed funds may receive any form of interest nor may be negotiable, not a single cent of it, otherwise it would make it Haram (Islamically Forbidden).

353. The defendant(s) did/have not accepted the Plaintiff's proposal.

354. On December 22, 2007 a Muslim Correctional Officer aware of the ongoing discrimination against Muslim(s) informed the Plaintiff that the defendant(s) are not allowing Muslim volunteer(s)

from his Mosque, the "Windsor Masjid" at Windsor, Connecticut and other Mosques, to enter the Connecticut Department of Corrections as Volunteers.

355. On December 25, 2007 the defendant(s) served French toast, grits, sausages, etc., for breakfast, and Roast beef, icecream sandwiches, and much more, for lunch for the Christian inmates' Christmass Celebration; an act which is not essential in the Christian Faith.

356. On December 26, 2007 the defendant Rene Keida summoned the Plaintiff to his office. Defendant Keida wanted to talk on issues pending in the Plaintiff's Civil Rights Action 3:04CV1215 (DFM), the Plaintiff explained that on advice of counsel the Plaintiff is not allowed to discuss the matter(s) pending before the United States District Court with any-one.

357. Defendant Rene Keida agreed to change the subject, he agreed that Turkey during Thanksgiving and Roast Beef during Christmass are not essentials of the Christian Faith. And most shocking to the Plaintiff was that defendant Rene Keida admitted/confessed to the Plaintiff that Muslims are his enemies.

358. On December 28, 2007 at approximately 2:25 p.m. upon completion of the Islamic Friday Congregational Jumu'ah Salat (Prayer) while the multipurpose room was full of Muslim inmates Correctional Officer Teller entered the room using real Foul and vulgar language, Cursing words, he walked right on the Muslims' Islamic Praying rug and deliberately passed a real loud and stinking fart. Deliberately disrespecting all Muslims (the Plaintiff) in the room in a discriminating fashion.

359. The Plaintiff was on the opposite side of the room and was able to smell the horrible stinking smell, sought refuge in Allah, and told Correctional Officer Teller that I (the Plaintiff) was going to report him to Warden Peter Murphy.

360. The Plaintiff reported c.o. Teller's action(s) to Warden Peter Murphy, however, Peter Murphy is widely known to justify and make-up excusses for correctional officers.

361. On January 5, 2008 at approximately 12:45 p.m. the Plaintiff was informed he had a visit. Upon arrival to the visiting room the Plaintiff's mother, Ms. Iris Vega, was crying and informed the Plaintiff that a Correctional officer-

whom the Plaintiff later found-out was Gary Trowers – Compelled her to remove her bra against her will because the metal detector was allegedly going off.

362. Plaintiff's mother informed the Plaintiff, and based upon what the Plaintiff understood, that after the metal detector went-off defendant Gary Trowers compelled Ms. Iris Vega to remove her bra.

363. The Plaintiff requested to speak to the shift commander, who arrived immediately. When the Plaintiff complained about what had just been done to the Plaintiff's mother, Ms. Iris Vega, immediately and without looking at the vedeo camera or investigate the matter defendant Lieutenant Allen stated "... That did not happen!".

364. The defendant Lieutenant Allen started getting extremely loud, belligerent, and antagonistic towards the Plaintiff. The Plaintiff requested to resume his visit because he (the Plaintiff) felt threatened by Lieutenant Allen's attitude. Then Lieutenant Allen, who was with another Lieutenant, yelled at the Plaintiff "... dont you walk away from me!"

365. The Plaintiff felt extremely fearful and did not know what Lieutenant Allen was about to do to the Plaintiff. He made the Plaintiff feel as if the Plaintiff did something wrong, when the Plaintiff just made a report of what was done to the Plaintiff's mother Ms. Iris Vega.

366. The Plaintiff was allowed to resume the visit after Lieutenant Allen was finished venting-off. Minutes later the defendant Gary Trowers entered the visiting room - non contact area, where there are approximately 3 or more cameras, threatning the Plaintiff with a disciplinary report, then he ordered the Plaintiff to hand-over his identification card.

367. Approximately (10) ten minutes later defendant Lieutenant Allen asked the Plaintiff to ask Ms. Iris Vega (the Plaintiff's Mother) if she wanted to file a complaint? Ms. Iris Vega replied; "yes". The Plaintiff's Mother was crying, tears running down her eyes. This had an awful affect on the Plaintiff; however, the effect on the Plaintiff's mother and Family (Plaintiff's daughter) may be possibly wurst.

368. Same day, January 5, 2008 at approximately 10:50 p.m. a verry odd time to summon any

inmate out his cell - after count time no inmate is allowed to be out of his assigned cell - the Correctional Officer stationed at I' Unit informed the Plaintiff that Lieutenant Allen wanted the Plaintiff at his office.

369. On the Plaintiff's way to Lieutenant Allen's office the hall-way was very dark, the lights were off, the whole seen was scary. Upon arrival Lieutenant Allen asked the Plaintiff to have a seat. Lieutenant Allen seemed as to want to down-grade the situation - what was done to the Plaintiff's mother. He then informed the Plaintiff that his sister is a Muslim, and more.

370. According to a Muslim correctional officer who has worked in the visiting-room area - there are policies and procedures to be followed by all correctional officers stationed at the visiting room area. He informed the Plaintiff that before a visitor is asked to remove any clothing - such as Ms. Iris Vega's bra - there must be consent given and forms filled-out and signed by the visitor. According to Plaintiff's Mother such policies and procedures were not followed.

371. The defendants' actions against Ms. Iris Vega were in further retaliation and out-right abuse of authority because of the Plaintiff's Civil Rights

Actions pending before the United States District Court and the Line Grievances the Plaintiff has filed against Correctional officials and conditions of confinement.

372. On January 7, 2008 Deputy Commissioner Brian K. Murphy, Warden Peter Murphy, and Counselor Paskins toured the Plaintiff's assigned housing unit (I-1) at MacDougall-Walker Correctional Institution, at approximately 11:55 a.m. The Plaintiff informed Deputy Commissioner Brian K. Murphy about the wrong (crime) done to the plaintiff's mother on January 5, 2008.

373. Deputy Commissioner Brian K. Murphy told the plaintiff that he would send some-one to talk to the Plaintiff. The plaintiff's cell partner at that time Luis Algarin # 307686 was present.

374. Counselor Paskins become active on the issue. She requested for the Plaintiff to put in writing briefly what occured on January 5, 2008, then Ms. Paskins stated that she was forwarding the issue to Captain Knapp.

375. Captain Knapp's respond, not on papers or documents to the best of the Plaintiff's knowledge, was a cover-up.

376. On January 7, 2008 the Plaintiff submitted an inmate request form addressed to Grievance Coordinator Counselor Vadnais addressing the fact that a pair of replacement boots were mailed (by "East Bay") to the Plaintiff as instructed in the care of Captain Beaudry. And letting him know the fact that the boots has no metel heal support, it has an air bubble made out of plastic.

377. On January 8, 2008 the defendant Anthony J. Bruno acknowledged receiving the Plaintiff's December 19, 2007 inmate request form, forwarded to him by associate chaplain Rene Keida.

378. On January 9, 2008 the Plaintiff filed a Line Grievance IGP No. 137-08-208 grieving the January 5, 2008 unlawful strip search of the Plaintiff's mother Ms. Iris Vega. The Plaintiff requested a review, change of policy and procedure(s), and/or a written apology letter addressed and mailed to Ms. Iris Vega, if none of the above then the Plaintiff requested the defendant(s) to preserve the vedeo(s), report(s), etc., for a Judicial Review of the evidence.

379. On January 9, 2008 defendant Captain

Beaudry responds and informs the Plaintiff that he has not been informed that the boots for the Plaintiff had arrived.

380. On January 10, 2008 the defendant(s), Wayne T. Choinski and others, after being informed, investigating, and reviewing the complained about facts, denied the Plaintiff's Line Grievance IGP No. 137-08-156 appeal. He checked off the box where it states "... This grievance may not be appealed to level 3 ..."; therefore, the Plaintiff has exhausted his administrative remedies.

381. On January 10, 2008 the Plaintiff received a respond to Plaintiff's January 7, 2008 request addressed to Line Grievance Coordinator Counselor Vadnais. Counselor Vadnais stated "Mr. Vega. I have no good news for you. Capt. Beaudry said boots were sent back, but I believe he was referring to ones that were a wrong color quite a way back. C/O Arzt said he did not receive boots since Nov. C/O McC (property officer), said nothing came in for you. I certainly do not like being the middle man and wish I had better news for you. If by chance boots are to be mailed to you again - you have permission to have them

sent in my name - Counselor Vadnais ...".

382. On January 12, 2008 approximately 11:10 a.m. correctional officer Trowers was at the Unit (I-1) where the Plaintiff was housed. The Plaintiff was one of the last inmate(s) to exit the unit (I-1) for lunch. Correctional officer Trowers told correctional officer Facle ..." thats him ...", while pointing at the Plaintiff.

383. Thereafter, January 12, 2008 correctional officer Trowers would start showing-up everywhere the Plaintiff was at trying to intimidate the Plaintiff and pointing out the Plaintiff to other correctional officers.

384. On January 16, 2008 the Plaintiff filed a Line Grievance IGP No. 137-08-218 where the Plaintiff addressed the denial of the Islamic Eid-Ul-Adha Feast, and the denial of the Islamic main essential aspect of the Eid-Ul-Adha Feast, the Halal Zabihah (Islamically sacrificed meat) meal to the Plaintiff (and other Muslims) on December 19, 2007, yet, the defendant(s) provide Turkey for Thanks Giving, Roast Beef on Christmass, Hot dogs and Cheese burgers on the 4rth of July, and Fish on every

Friday imposing Catholic tradition(s) on all inmate(s), the Plaintiff, against his Islamic Religious essential mandates.

385. On January 16, 2008 the Plaintiff filed a Line Grievance IGP No. 137-08-219 addressing the discriminating policy and action(s) of the defendant(s) denying the Plaintiff (and other Muslims) to order Religious Educational CD's while allowing Christian Faith inmates and other Religious Faiths to order Religious CD's. The Plaintiff further requested approval to receive donated Islamic Religious and Educational CD's while citing a similar situation Civil Action ... Jesus Christ Christian Ministry v. CDCR, 456 F. Supp. 2d 1188 (2006).

386. As of January 18, 2008 the MacDougall-Walker Correctional Institution's Medical Department would call and summon the Plaintiff then call back disregarding the summon/call.

387. On January 23, 2008 the defendant Peter Murphy after reviewing the evidence at his disposal, vedeo camera/security camera Tapes etc., and knowing that his officer(s) violated the Rights of a Free Citizen/visitor and that/those of the plaintiff's, along with violation of Connecticut

Department of Correction policy, he denied the Plaintiff's Line Grievance IGP No. 137-08-208. The Plaintiff Appealed.

388. On January 28, 2008 the Plaintiff submitts an inmate request form to Counselor Vadnais informing him that the Plaintiff's mother informed the Plaintiff that the boots were mailed again. Counselor Vadnais responded that same day ... "They are here, they need to be passed thru the metal detector. From what has been relayed to me, as long as there no metal shanks in the sole - they will be processed in. I asked security to let me know either way. P.S. They came in Captain Beaudry's name.".

389. On January 30, 2008 the defendant Peter Murphy after reviewing the facts, concerns, and issues as a matter of Law denied the Plaintiff's Line Grievance IGP No. 137-08-218. The Plaintiff appealed.

390. On January 30, 2008 the defendant Peter Murphy after reviewing the facts concerns, and issues as a matter of Law denied the Plaintiff's Line Grievance IGP No. 137-08-219, regarding Plaintiff's request to purchase Religious CD'S. The plaintiff appealed.

391. On January 31, 2008 the Plaintiff was summoned to the Medical X-ray room. X-rays were taken of the Plaintiff, for that reason the doctor prescribed pain medication; however; ignored the plaintiff's foot fongus that had been on the Plaintiff's feet approximately a year, and it was being ignored by the doctor Silvis and Mr. Richard Furey.

392. On February 3, 2008 Correctional Officer Trowers came to the Plaintiff's cell door (I-21) Called the Plaintiff in a nasty provocative fashion, real loud. The Plaintiff's cell-partner was provoked by the fashion in which correctional officer Trowers was yelling at the Plaintiff for no apparent reason except that officer Trowers wanted and was retaliating against the plaintiff because the plaintiff filed a Line Grievance, IGP No. 137-08-208, against him, (and others involved), reporting the January 5, 2008 illegal action(s) taken against the Plaintiff's Mother Ms. Iris Vega which has had a real negative impact on the Plaintiff to the point where the Plaintiff did not want any visits to prevent his family from ever going through anything similar again.

393. The defendant Correctional officer Trowers

started showing-up at places where the Plaintiff happened to be at, sort of stalking the Plaintiff, at the I-1 unit, while he was not stationed there, at the Plaintiff's cell, at the chow Hall, at vocational education department, in the Hall-way, at MacDougall-Walker Correctional Institution's extension Unit(s), this defendant was trying to harass, provoke, intimidate, and trouble the Plaintiff all because the plaintiff filed a Line Grievance (reported) against him, (and others).

394. On February 6, 2008 Correctional Officer Arzt summoned the Plaintiff to the admittance and Process (A & P) room under escort to issue the Plaintiff a urine screening test, which resulted clean, the Plaintiff does not do illegal drugs nor does he drink alcohol. The Plaintiff believes the urine test was part of the ongoing harassment and retaliation by the defendant(s).

395. On February 13, 2008 at approximately 6:00 a.m. the defendant correctional officer Trowers was following the Plaintiff on the Plaintiff's way to the chow-Hall dining area. Upon the plaintiff's exit the defendant, C.O. Trowers, yelled at the Plaintiff ---"I got you now".

396. On February 19, 2008 the Plaintiff submitted an Inmate Request Form addressed to Counselor Vadnais asking him about any up-date on the Plaintiff's boots.

397. On February 21, 2008 Counselor Vadnais responded to Plaintiff's February 19, 2008 Inmate Request Form stating "... The boots were in c/o Arzt's possesion, he has not been able to screen them yet. But hopefully it will be soon.".

398. On March 7, 2008 the defendant Wayne T. Choinski after reviewing, being informed, and investigating the complained about fact sorrounding Line Grievance IGP NO. 137-08-208, the illegal strip search of Plaintiff's mother Ms. Iris Vega, denied it. He checked-off the box where it states "... You have exhausted the Department's Administrative Remedies. Appeal to level 3 will not be answered."; therefore, the Plaintiff has exhausted his administrative remedies.

399. On March 11, 2008 the Plaintiff followed Counselor Vadnais' instructions, i.e., to write to him a reminder in regard to the Plaintiff's boots.

400. On March 12, 2008 Counselor Vadnais

replied to the Plaintiff's request "... C/O Arzt will be getting in touch with you. There seems to be a problem. He will explain, I am sorry for the inconvenience and do appreciate your patience.".

401. On March 16, 2008 the Plaintiff wrote to Correctional officer Arzt asking him that if the boots did have a metal heal support to be allowed to remove it/them. However, the plaintiff knew the boots did not have metal heal support, they had/have a plastic air buble, its make is Nike Air Max boots.

402. The defendant(s) were lying about the boots having metal heal support.

403. On March 19, 2008 defendant Correctional officer Trowers entered the I-1 Unit, where the Plaintiff was housed, accompanied with counselor Paskins. He seemed to be talking about the Plaintiff, not audible to the Plaintiff, then thanked Correctional officer Martinez and exitted I-1 unit.

404. On March 20, 2008 correctional officer Arzt replied to the Plaintiff's March 16, 2008 request, stating ..." the support cannot be removed. Per. Captain Beaudry. You need to furnish me

with an address and we will mail these boots out.", "Arzt".

405. The Plaintiff knows the account given by Correctional officer Arzt and/or Captain Beaudry is not true. The Nike Air Max Boots did not/does not have metal heal support (shank).

406. The Plaintiff knew at a later moment that because of the Plaintiff's pending action(s) before the United States District Court, Joe Burgos Vega v. Theresa Lantz, et al., 3:04CV1215 (DFM), these official(s) were conspiring, retaliating, and even discriminating against Muslim(s) inmate(s), the Plaintiff (and others), in a systematic fashion by misusing the trust of their office in their individual and official capacities.

407. On or around March 24, 2008 the defendant(s) inspected the Vocational Education room area where the plaintiff studied, looking for something or anything to accuse the Plaintiff with.

408. On April 14, 2008 the Plaintiff responded to correctional officer Arzt's March 20, 2008 reply request — "I am in receipt of your

reply to my last inmate request form in which you inform me that the boots mailed to me back in December 2007 cannot be issued to me because of some metal heal support. You asked me to provide you with an address to send them to. Please return the boots to sender with a note explaining that metal heal support in boots cannot be accepted in this facility. Furthermore, describe the condition of the boots as they are in order to ward off any claims that they were damaged. please issue me a copy. Thank you for your time and attention.".

409. On April 16, 2008 the Plaintiff wrote to Mr. Abner Burgos Rodriguez from the State of Connecticut Department of "Puerto Rican-Latin Affairs Commission", regarding the State of Connecticut ranking #1 (number one) in the United States in levels of racial disparity on the State Judicial process. Sentences given to Puerto Ricans (Latinos) and African Americans verses the Sentences issued to whites reveal an alarming level of racial disparity. Something known to the defendant(s), Governor M. Jodi Rell and others, for several years yet defendant(s) have not taken any action to resolve the problem existing, and the problem caused by it,

along with the harm(s) done and created to the Plaintiff, and other(s). The Plaintiff asked for some assistance, no respond received by the Plaintiff.

410. On April 17, 2008 the defendant Anthony J. Bruno replied and denied the Plaintiff's April 11, 2008 Religious Request for approval to purchase an electronic digital Qurán that stores volume(s) wurth of Islamic essential information in it, has no online access/capabilities nor digital satelite availability.

411. On April 18, 2008 doctor Silvis summoned the Plaintiff to his office. He informed the Plaintiff it was recorded on his file(s)/document(s) that the Plaintiff was refusing his medication. The Plaintiff explained that that was not true and impossible, and requested to confirm it with records because for almost a year (approximately 7 months to 9 months) the Plaintiff was denied medication prescribed for the Plaintiff's back, hips, knees, and feet conditions, and the Plaintiff submitted numerous Inmate Request Forms to the Medical Department followed with numerous Inmate Line Grievance(s) all of which were denied, mostly by defendant Richard Furey. Doctor Silvis searched records and stated that the

Medical Department (the defendants) refused to deliver and issue the Plaintiff his Chronic pain medication because they thought it was psychological medication. He re-prescribed the Medication, along with recommendation that the Foot Specialist evaluate the Plaintiff's Feet/leg Condition in order to prescribe special sneakers - shoes - work boots, etc.

412. On April 22, 2008 the defendant Correctional officer Arzt issued the Plaintiff a crafty retaliatory and conspiratorial disciplinary report, Class B, charging the Plaintiff with "Contraband (conspiracy to Convey)", disciplinary report # M-WCI. 0804089 in which the defendant made accusations that did not exist and/or did not happen, untrue, and a Creation of his own imagination.

413. At no moment did the Plaintiff conspire to convey contraband into MacDougall-Walker Correctional Institution.

414. In defendant's, Correctional officer Arzt's, retaliatory action(s) by reinterpretating the Plaintiff's out going letter/mail to his own scheme or malicious interpretation, the defendant (and others involved)

deliberately ignored a well known Connecticut General Statute § 18-81-31 (c)," Limitations on Restrictions", along with the Plaintiff's United States Constitutional Rights provided by the First Amendment of the United States Constitution. Moreover, the defendant violated Connecticut Department of Correction Administrative Directive 10.7, section 4 (E) 1.

415. The body of the Plaintiff's letter dated April 19, 2008 is specific and speaks for itself.

416. The defendant(s), Correctional officer Arzt and others, deliberately ignored and violated the applicability of Connecticut General Statute(s) § 18-81-28 through § 18-81-51.

417. The Plaintiff requested to have Religious oil(s) donated to the MacDougall-Walker Correctional Institution's Religious Department, <u>not to the Plaintiff.</u> The Religious department after receiving the donation and inspecting it for contraband would had made a determination of whether or not to accept the donation. If accepted it would had been distributed by the Religious department official(s) as done with

other donated materials/items such as cuffis, Prayer Rugs, Qurans, Hadiths, Tafsirs, other Religious books, etc.; if rejected, it would had been returned to sender, as is done with all donation(s) to the Religious Department.

418. There is/was no written regulation prohibiting inmates, the Plaintiff, from asking Citizen(s) to possibly have Religious donation(s) sent by an organized well known and respected Religious Community to the Connecticut Department of Correction's Religious Department.

419. The allegations/accussations made by Correctional officer Arzt never occured nor did it exist.

420. Furthermore, the Plaintiff requested to have an "authorized" inexpensive Guess watch mailed to the MacDougall-Walker Correctional Institution's Property officer as approved him, Correctional officer McCormick, on August 29, 2007 but it did not happen.

421. On April 29, 2008 or around April 29, 2008 Correctional officer Trowers entered I-1 unit, the Unit where the Plaintiff was housed in,

harrassing, intimidating and mocking the Plaintiff by making fun of the Plaintiff's issued Disciplinary Report # M-W.C.I. 0804087.

422. On May 5, 2008 the Plaintiff met and spoke with assigned advocate in regard to disciplinary report M-W.C.I. 0804087. The Plaintiff gave her copies of his authorization form(s), and the Plaintiff requested for copies of:

a. Unit Administrator's request and designation to have the Plaintiff's out-going mail retreaved, read, and reason(s) why? All document(s) pertinent to M-W.C.I. 0804087, investigation reports witnesses statement(s), etc.

b. Testimony of witnesses: Captain Frey Correctional Officer McCormick, etc.

c. And all documents pertinent to disciplinary Report # M-W.C.I. 0804087.

423. On May 8, 2008 the Plaintiff filed an Inmate Line Grievence IGP No. 137-08-282 grieving the defendant(s), Anthony J. Bruno and others, denial of authorization for

the Plaintiff to purchase a "PenMan Digital Qurán".

424. The Plaintiff explained that the "PenMan Digital Qurán" is more than a Religious request under United States Constitution First and Fourteenth Amendment, (RLUIPA) 42 U.S.C. § 2000cc-1, 2, 3, 4, 5, 6, and 7, Connecticut General Statutes § 52-571 b, the "PenMan Digital Qurán" would be helpfull for the plaintiff, and other Muslims, to learn more about the sciences and branches of Islamic Knowledge and to comply with Connecticut Department of Correction Administrative Directive 6.10, Titled: "Property", section #16, "LIMITATION ON PROPERTY". Moreover, the fact that the defendant(s) through the Connecticut Department of Correction's Commissary were/is selling a variety of electronics in particular "GameBoys", CD players, radios, Flat screen T.V.'s, and a large variety of electronic items. The "GameBoys" is very similar to the requested "PenMan Digital Qurán".

425. The PenMan Digital Quran, model RS-3000SHE (a 4322) has no satellite, Internet, or other type of accessabillity. It only has the program in it, the Quran in Arabic and English, and Volumes wurth of Commentary.

Saves space the equivalent of approximately 14 to 16 volumes (600 to 800 pages per volume) based on the Plaintiff's estimate.

426. On May 8, 2008 the Plaintiff was issued a Disciplinary Hearing for disciplinary report M-W C.I. 0804087, at approximately 9:00 a.m. John Doe (later found-out that he was suppose to replace the plaintiff's Advocate) asked the Plaintiff what was the Plaintiff there for? The Plaintiff explained. John Doe replied ..."not with a hat like that". He was refering to the Plaintiff's Islamic Cuffi.

427. Defendant Maureen Allen did not want to remove herself as disciplinary investigator, nor did the defendant(s), Disciplinary Hearing Officer Lieutenant Neil Cormier, after the Plaintiff made it known that she could not be impartial when the Plaintiff had filed an action in Court against her before, and because of that reason and other(s) cited above the Plaintiff requested that Ms. Maureen Allen be removed. The Disciplinary Hearing officer Neil Cormier denied the Plaintiff's request stating no reason(s).

428. The disciplinary hearing officer Neil Cormier (hereon forward will be referred to and abreviated as DHO) refused to allow the Plaintiff to introduce known to the defendant(s) exculpatory evidence and did not state a reason(s).

429. The Plaintiff was not issued copies of witnesses' statement(s) who seem to have lied, or the defendant Maureen Allen altered their statements/testimony. For that reason the Plaintiff was not given an opportunity to prepare reasonably against such untruthful alleged testimony. Moreover, the Plaintiff requested a continuance and the DHO denied it without stating a reason(s).

430. No reason was given nor stated for the DHO to exclude the witnesses from testifying in person where the Plaintiff could have asked them question(s) to generate answers leading to the plaintiff's exoneration of disciplinary report # M-W C.I. 0804087 although the Plaintiff requested live witness testimony.

431. The defendant(s), DHO and other(s), refused to read the actual (evidence) letter and was persuaded by the untrue and

altered allegation(s) in the disciplinary report # M-W.C.I. 0804087, and Maureen Allen's non-impartial investigational reports which were never made known to the Plaintiff.

432. The Plaintiff informed the defendant DHO about the defendants' violation(s) of Connecticut General Statute §18-81-31(a) and §18-81-31(c), and requested the documentation which was denied without stating a reason.

433. The defendant DHO found the Plaintiff guilty based on untrue altered allegations that did not exist nor did it happen, non-impartial and altered investigation report(s), biased testimony, and other retaliatory and discriminatory motives because of the plaintiff's Islamic Faith and the Plaintiff's fillings of Line Grievance(s) and Litigation(s) before the United States District Court.

434. The defendant(s), DHO and others, severely sanctioned the Plaintiff to punitive segregation for a Class B disciplinary report # M-W.C.I. 0804087 when punitive segregation is normally given/sanctioned to Class A disciplinary report allegations' guilty findings.

435. After the Plaintiff was handcuffed by a Correctional officer and was escorted to an RHU Cell, an inmate worker at RHU informed the plaintiff that Maureen Allen was talking to the DHO and made a statement... "Lets hang this one, I dont like him", as the Plaintiff was entering the disciplinary hearing room.

436. The defendant(s) had a particular cell already reserved for the Plaintiff, RHU Cell #6, which was extremely dirty, had feces smeared all over the walls, floor, bunks, and toilet. The toilet was full of human waste and did not flush. The plaintiff was made to complete his ten (10) days punitive segregation sanctions in the cell under these same condition(s).

437. The Plaintiff requested to be moved to another cell, no action was taken by RHU Correctional officers, nor the RHU Unit Manager.

438. The Plaintiff requested Cleaning supplies which were denied as well.

439. The Plaintiff mentioned the nasty cell Conditions in the disciplinary report Appeal Form

(disciplinary report Appeal Form M-W C.I. 0804087) praying for some-one to take some type of action but the defendant(s) did nothing.

440. On May 9, 2008 the Plaintiff filed disciplinary report M-W C.I. 0804087 appeal form stating reasons for appeal, the cell conditions RHU #6, administrators, the defendant(s) took no action nor reversed the findings.

441. The RHU cell #6 Condition(s) interefered and violated the Plaintiff's Religious Rites of worship in addition the pain and suffering that the plaintiff endured.

442. On May 18, 2008 the Plaintiff completed the ten (10) days punitive segregation sanction, was released and housed at the MacDougall-Walker Correctional Institution's general Population Q-pod/unit.

443. Upon arrival at the Q-pod/unit the Plaintiff was made aware by other Muslims that Islamic Services were being made available only once every 5 to 6 weeks. This was limitted to Jumuah Friday services and not to include Taleem (Islamic Class/Studies), although Christians, Native Americans, and other

Religious denominations did not have or were given not the same Religious restrictional problems as was given to the Muslims, the Plaintiff.

444. On May 23, 2008 the Plaintiff wrote to the Religious Coordinator the defendant Rene Keida and respectfully requested for weekly essential Islamic Friday Congregational Jumuah services which were not being made available at the MacDougall-Walker Correctional Institution's Q-pod/unit; while being provided for the general population in the main building every week.

445. Q-pod/unit is a general population pod/unit as defined (at that time 05/23/2008) by public information records.

446. The Plaintiff pointed out that since all other programs are done with the main building's general population, without separation, there should be no reason for the Plaintiff (and other Muslims) not to be allowed to attend weekly Taleems and Jumuah services with the main building. However, in the event that the Plaintiff's suggestions was not a possibility, the Plaintiff suggested numerous alternatives to provide the Plaintiff (and other Muslims) with Islamic weekly services as a minimal and least restrictive alternative(s).

447. Prior to May 26, 2008 the Plaintiff wrote to the MacDougall-Walker Correctional Institution's Medical Department requesting to have Plaintiff's bottom-bunk pass renewed due to Plaintiff's medical condition(s). On May 26, 2008 a medical personel informed the Plaintiff that if he has not heard from the doctor then that means that the doctor, defendant doctor Silvis, has denied the Plaintiff's bottom bunk-pass renewal request. Meanwhile the Plaintiff had to sleep on the cell floor.

448. On May 26, 2008 the Plaintiff filed a Medical Line Grievance IGP No. 137 regarding the bottom-bunk renewal and informed the defendant(s) that the Plaintiff was sleeping on the cell floor.

449. On May 27, 2008 the defendant Peter Murphy denied the Plaintiff's Line Grievance IGP No. 137-08-282. The Plaintiff appealed.

450. On May 29, 2008 the defendant Rene Kelda responded to Plaintiff's May 23, 2008 Inmate Request Form. The defendant referred the request to the director of Religious Services defendant Anthony J. Bruno.

451. On June 3, 2008 the defendant Wayne T. Choinski after knowing, investigating, and becoming aware of the facts surrounding the Plaintiff's disciplinary report, and RHU cell #6 conditions, denied the Plaintiff's disciplinary report appeal # M-W.C.I. 0804087. The defendant checked off the box where it states ..."You have exhausted DOC'S Administrative Remedies."; therefore, the Plaintiff has exhausted his administrative remedies.

452. On June 5, 2008 the Plaintiff filed a Line Grievance IGP No. 137-08-315 due to the defendant(s) denial in providing general population Muslim inmate(s), the plaintiff, at Q-pod/unit the essential weekly Islamic Friday Jumuah congregational Prayer services, which there is well known established law.

453. On June 7, 2008 the defendant(s), Richard Furey, Doctor Silvis, and others, denied the Plaintiff's Medical Line Grievance IGP No. 137, where the Plaintiff requested renewal of bottom bunk pass due to his medical conditions. The box where it states..."You have exhausted DOC'S Administrative Remedies." was checked off; therefore, the Plaintiff has exhausted his administrative remedies.

454. On or around June 13, 2008 the Plaintiff discovered that the Plaintiff's outgoing mail was not reaching (being received) the Plaintiff's family, the plaintiff notified defendant Captain M. Beaudry.

455. On June 20, 2008 the defendant Peter Murphy denied the plaintiff's Line Grievance IGP No. 137-08-315 after knowing of the denial of Jumuah services at Q-pod/unit. The Plaintiff appealed.

456. On June 30, 2008 the defendant Wayne T. Choinski denied the Plaintiff's Line Grievance Appeal IGP No. 137-08-218 regarding the defendant s' denial to provide the Plaintiff (and other Muslims) an Eid-al-Fitr feast as mentioned above. The defendant checked off the box where it states ..."You have exhausted the department's Administrative Remedies. Appeal to Level 3 will not be answered."; therefore, the Plaintiff has exhausted his administrative remedies.

457. On June 30, 2008 the defendant Wayne T. Choinski denied the Plaintiff's Line Grievance Appeal IGP No. 137-08-219 regarding the

Plaintiff's Religious request for approval to purchase Islamic educational CD'S. The defendant checked off the box where it states... "You have exhausted the department's Administrative Remedies. Appeal to Level 3 will not be answered."; Therefore, the plaintiff has exhausted his administrative remedies.

458. On July 9, 2008 unit manager Captain Wright E-mailed defendant Richard Furey because the Plaintiff was being neglected of a serious medical condition, the defendants were not Calling the Plaintiff for scheduled appointment(s). According to Doctor Silvis another appointment was re-scheduled to the first week of July 2008.

459. On July 16, 2008 at approximately 6:30 a.m. the MacDougall-Walker Correctional Institution's N-unit CTO summoned the Plaintiff and informed the Plaintiff that the Warden, defendant Peter Murphy, ordered him to conduct a urine test on the Plaintiff. The Plaintiff gave him the urine specimen, which resulted negative for any Illegal substances.

460. On July 16, 2008 at approximately 5:30 p.m. MacDougall-Walker Correctional

Institutional officers locked-down N-unit. Correctional Officers with hostile aggressive J.B.V. [redacted] attack dogs walked to the Plaintiff's Cell door and informed the Plaintiff that the defendant Captain Beaudry summoned the Plaintiff to the Unit manager's office, Captain Wright's office.

461. Defendant, captain Beaudry, wanted and insisted on speaking to the Plaintiff. The Plaintiff informed him that if he would call the Plaintiff's civil attorney, Attorney William K. Piotrowski, and should he advise the Plaintiff to talk to captain Beaudry then the Plaintiff would have no objection towards talking to Captain Beaudry. On advice of the Plaintiff's attorney, William K. Piotrowski, the Plaintiff is not to speak to any one about Islamic surrounding issues because it would pertain to the pending action of Joe Burgss Vega v. Theresa Lantz, Et al., 3:04CV1215 (DFM).

462. The defendant captain Beaudry insisted that he wanted to speak to the plaintiff about an issue having nothing to do with the Plaintiff's ongoing Litigation. Captain Beaudry asked the Plaintiff if he knew anything about an alleged