UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JOE BURGOS VEGA, | : | |
|     Plaintiff, | : | |
| | : | |
| v. | : | CASE NO. 3:09-cv-737 (VLB) |
| | : | |
| GOV. JODI RELL, et al., | : | |
|     Defendants. | : | March 24, 2014 |

## ARTICULATION OF THE COURT'S DISMISSALS AND ENTRIES OF JUDGMENT

Following the evidentiary stage of a trial in this matter, the Defendants made motions to dismiss and for judgment as a matter of law which the Court granted. Although the Court stated the reasons for its orders from the bench, it now articulates those reasons more fully to aid in the appellate court's consideration of the Plaintiff's appeal. *See U.S. v. Viola*, 12-4160, 2014 WL 503069, at *2 (2d Cir. Feb. 10, 2014) (although a notice of appeal confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal, the district court "still may act in aid of the appeal" and "[t]hus, where a district court does not 'act[ ] impermissibly to modify a judgment substantively,' but simply clarifies its order, we have viewed such modifications as acts in aid of the appeal."); Leonhard v. United States, 633 F.2d 599, 609-10 (2d Cir. 1980) ("Once a proper appeal is taken, the district court may generally take action only in aid of the appeal or to correct clerical errors as allowed by the Federal Rules of Civil (or Criminal) Procedure.").

1

Pursuant to Federal Rule of Civil Procedure 50, a Court may grant judgment as a matter of law where "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). A party may make a motion for judgment as a matter of law "at any time before the case is submitted to the jury." Fed. R. Civ. P. 50(a)(2). In ruling on a motion for judgment as a matter of law, a court may consider all of the evidence in the record, but it "must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Cross v. New York City Transit Auth.*, 417 F.3d 241, 247 (2d Cir. 2005) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). A Rule 50 motion may be granted where "there can be but one conclusion as to the verdict that reasonable men could have reached." *Cross*, 417 F.3d at 248 (internal quotation marks and citation omitted).

The Plaintiff, Joe Burgos Vega, filed this action on May 5, 2009. On September 6, 2012, after numerous extensions of time and a ruling on the Defendants' first motion for summary judgment, the Court set the deadline for the parties' joint trial memoranda for November 9, 2012; the case was scheduled to proceed to jury selection on January 29, 2013 and to trial in February, 2013. [Dkt. no. 159]. The parties, however, were not prepared to proceed to trial at that time. [See. Dkt. no. 201]. After a conference between the parties and the Court, the Court set a new scheduling order, allowing the parties an additional sixteen months to conduct discovery, granting Defendants' request to file a second

2

motion for summary judgment, and allowing the Plaintiff more opportunity to prepare for trial.  [Dkt. nos. 202, 203].

At the time this scheduling order was entered, the Court discussed with Mr. Vega in detail the need to and the process for procuring witnesses and experts to testify at trial.  Mr. Vega was informed by the Court on the record – a fact acknowledged by Mr. Vega during this trial – that it was his responsibility to identify and arrange for the presence of witnesses at trial, and that the Court would issue subpoenas for him to serve upon his request.  The Court specifically advised Mr. Vega of the need to contact experts and witnesses in advance of trial, and discussed the potential availability of certain of Plaintiff's desired witnesses.  The Defendants also agreed to make then-current Department of Corrections employees and officials available for trial upon Mr. Vega's request.  On the eve of this trial, nearly a year after having first discussed trial preparation with Mr. Vega, the Court re-engaged the Plaintiff on these issues, reminding him of the need to present witnesses at trial and of the availability of Court resources to assist him.  In addition, the Court issued writs of habeas corpus for the production of four inmate witnesses at Mr. Vega's request, including two witnesses who were produced but who Mr. Vega later chose not to call.

Notably, Mr. Vega has legal training and experience.  He completed a paralegal program in which he earned a grade point average of approximately 98 percent.  He demonstrated the ability to assimilate and apply legal rules and principles.  In addition to the instant case he filed and prosecuted two other cases: *Vega v. Lantz, et al* 3:03-cv-2248-PCD and *Vega v. Lantz, et al,* 3:04-cv-

1215-DFM.  He also actively participated in a trial of at least one comparable civil case in federal court with the assistance of counsel, and in which judgment was also entered in favor of the Defendants on all counts, and he was a defendant in a criminal case in which there was a jury trial in *USA v. Joseph Vega Burgos* 3:96-cr-00190-WWE.

In spite of this education and experience, the Court's advice and provision of resources, and the ample time afforded Mr. Vega in which to prepare for trial, the Plaintiff failed to call any Department of Corrections employee or official who could have testified to the characteristics of the cheese or Jolly Ranchers at issue in this case, or who could testify to Department of Corrections policies governing compact discs and electronic devices.  Given the complete lack of evidence supporting the Plaintiff's claims, the Court directed a verdict in favor of the Defendants, entering judgment in favor of five Defendants and dismissing the remaining eight.

<u>First Amendment Retaliation</u>

The Plaintiff's thirteenth cause of action alleged that Defendant correction officers Madison and Sanchez retaliated against him for filing a previous federal lawsuit in violation of the First Amendment by charging him with two disciplinary reports.  To sustain a First Amendment retaliation claim, a prisoner must demonstrate the following: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action."  *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citing *Dawes*

4

*v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds*, *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002)).

The only evidence Mr. Vega offered in support of these claims, however, was his testimony that Madison and Sanchez each made banal statements of fact that Vega had sued Department of Corrections officials.  Mr. Vega did not introduce any evidence that either man threatened or menaced him or that the statements were uttered with any invective.  No reasonable juror could find that these statements alone could prove that Madison or Sanchez retaliated against Vega when they each filed a disciplinary report of a physical altercation between Mr. Vega and his cellmate as required by Department of Correction policy.  Mr. Vega admitted to being involved in a violent altercation with his cellmate and that it was Department of Correction policy to discipline both inmates involved in an altercation.  The Defendants also introduced evidence and Mr. Vega admitted that his cellmate claimed Vega had attacked him, while Vega claimed he was attacked by his cellmate.  Mr. Vega testified that, hours before the altercation in question, he was attacked by this same cellmate, and he admitted that he did nothing to seek the assistance of or protection by prison officials.  Sanchez's and Madison's statements of fact are also insufficient to establish a causal connection to the disciplinary reports which Department policy required they complete because Mr. Vega offered no evidence as to when the officers made these statements.  Thus, there exists no evidence of temporal proximity between the statements and the issuance of the disciplinary reports.  *See Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009) ("A plaintiff can establish a causal connection that suggests retaliation

5

by showing that protected activity was close in time to the adverse action"). Lastly, to the extent that Mr. Vega claims that the disciplinary reports were issued in retaliation for his exercise of his faith, Vega presented no evidence whatsoever – testimonial or otherwise – as to this claim. Judgment as a matter of law was appropriate on Mr. Vega's retaliation claim (count 13).

## Religious Exercise Claims

Plaintiff's counts 4, 14, 15, and 21 each contain claims for violations of Mr. Vega's First Amendment right to free exercise of his religion and claims for violations of his rights under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") and Conn. Gen. Stat. § 52-571b.

A prisoner's free exercise claims are "judged under a 'reasonableness' test less restrictive than that ordinarily applied to alleged infringements of fundamental constitutional rights" and must be balanced against "the interests of prison officials charged with complex duties arising from administration of the penal system." *Ford v. McGinnis*, 352 F.3d 582, 588 (2d Cir. 2003). An inmate claiming a violation of this right must demonstrate that the government placed a substantial burden on the exercise of religious beliefs sincerely held and central or important to his religion. *Id.* at 592-93. A government regulation that burdens a protected right, however, does not violate the free exercise clause of the First Amendment "if it is reasonably related to legitimate penological interests." *Salahuddin v. Goord*, 467 F.3d 263, 274 (2d Cir. 2006) (citation omitted). The burden remains on the prisoner to demonstrate that the government's penological concerns are irrational. *Id.*

6

"RLUIPA protects inmates by providing that a government shall not 'impose a substantial burden' on the 'religious exercise' of inmates in certain institutions unless the government shows that the burden furthers a compelling governmental interest by the least restrictive means" of furthering that compelling government interest.  *Id.* at 273.  RLUIPA, however, "does not elevate accommodation of religious observances over an institution's need to maintain order and safety."  *Cutter v. Wilkinson*, 544 U.S. 709, 710 (2005).

Similarly, Connecticut law protects the rights of residents to exercise their religion.  Conn. Gen. Stat. § 52-571b echoes RLUIPA, providing that "[t]he state or any political subdivision of the state shall not burden a person's exercise of religion under section 3 of article first of the Constitution of the state even if the burden results from a rule of general applicability" except where application of such a burden "is in furtherance of a compelling governmental interest, and [ ] is the least restrictive means of furthering that compelling governmental interest."  Conn. Gen. Stat. Ann. § 52-571b(a), (b).

As to Mr. Vega's claim that the prison commissary's allegedly false labeling of Jolly Ranchers as Halal constituted violations of his religious rights, Vega failed to introduce any evidence upon which a reasonable jury would have a legally sufficient evidentiary basis to find in his favor.  First, although evidence demonstrated that a commissary order form from May 2006 listed Jolly Rancher candies as Halal and Kosher, and a subsequent commissary order form from May 2007 did *not* list Jolly Ranchers as Halal, Mr. Vega failed to produce any evidence whatsoever that Jolly Ranchers sold at the commissary at any time, including

7

those on the commissary order form dated May 2006 were not Halal.  Mr. Vega did not introduce any evidence of the ingredients included in the Jolly Ranchers sold on the May 2006 form, whether those ingredients were or were not Halal, or whether the company producing Jolly Ranchers changed the ingredients between May 2006 and May 2007 such that the commissary order form also changed to reflect this.  The only evidence presented at trial was Mr. Vega's own testimony that Jolly Ranchers have never been Halal, and his testimony that he relied on a book from a Muslim organization stating that Jolly Ranchers are not Halal.  Mr. Vega was not an expert and he offered no expert testimony despite the fact that his prison imam testified at the trial and could have been offered as an expert and in fact did offer opinion testimony on certain ecumenical issues without objection.  Fed. R. Evid. 702.  Further, the book on which Vega relied was inadmissible as it was unauthenticated hearsay within hearsay.  Fed. R. Evid. 801(c), 803(18), 805.  Mr. Vega did not offer an affidavit, certified copy, testimony or any other means of authenticating the book, despite his legal training, the Court's specific instructions, and the additional time afforded for trial preparation after those instructions were given.

Even if Mr. Vega's own opinion testimony could tend to establish that Jolly Ranchers were *never* Halal, which it cannot, Mr. Vega has failed to introduce any evidence that the Department of Correction's inclusion of the Halal designation on the May 2006 form was intentional or reckless and not merely negligent such that he could maintain a § 1983 action for deprivations of his constitutional rights.

8

**Second, Vega failed to introduce evidence of a firmly held religious belief that he could not eat Jolly Rancher candies or that eating Jolly Ranchers constituted a substantial interference with the practice of his religion.  On cross-examination, Mr. Vega was impeached by his commissary account records, which showed that he continued to purchase Jolly Rancher candies even after learning that they were not Halal in August 2007.  Indeed, these records demonstrated that Vega bought 87 packets of Jolly Ranchers after he testified learning that the candy was allegedly prohibited by his religion.  Vega admitted that he continued to purchase Jolly Ranchers after learning that they were not Halal, and attempted to rehabilitate his testimony by testifying that he did not eat the candy, but rather used the Jolly Ranchers to barter with other inmates for other items also available in the commissary.  Mr. Vega introduced no evidence tending to explain why inmates would barter for Jolly Ranchers, which were available in the commissary, with other items also available for purchase in the commissary.  Further, when his explanatory testimony was impeached by the introduction of the prison policy against bartering with other inmates, Vega explicitly denied the plain meaning of the express language of the policy and, after further questioning, eventually admitted that pursuant to this policy (of which he claimed he was unaware), bartering with other inmates was strictly prohibited.  Mr. Vega's attempt to rehabilitate his testimony was halting and incredulous.  He was clearly patently surprised and nonplussed by the presentation of his commissary purchase records, and hesitated in giving a response which was delivered in a desperate tone of voice distinctly different from that of his other testimony.**

9

**Even viewing the evidence in the light most favorable to Mr. Vega that he believed Jolly Rancher candy was Halal when he purchased them for his own consumption and that he continued to purchase them after he came to believe that they were not Halal solely to barter with other inmates, given that Mr. Vega introduced no evidence that Jolly Ranchers were in fact *not* Halal during the time they were listed as Halal on the commissary order form, he failed to introduce any evidence that his religious beliefs had been burdened in any way, let alone substantially burdened in contravention of either federal or state constitutional law.**

**Judgment as a matter of law was also proper as to Mr. Vega's fifteenth count based on a lack of evidence corroborating Mr. Vega's religious freedom claims.  Mr. Vega alleged in count fifteen that the cheese on the Department of Corrections' common fare menu was not Halal, thereby violating Mr. Vega's religious rights pursuant to the First Amendment's free exercise clause and the RLUIPA.  Mr. Vega introduced into evidence a photocopy of a portion of a cheese wrapper given to him by an inmate kitchen worker who testified that the cheese was served on the common fare menu.  The partial wrapper does not state that the cheese is Halal.  The ingredients listed on the wrapper include "enzymes," but the only evidence concerning enzymes was offered by Mr. Vega's witness, Imam Avci, who testified that enzymes could be made from either non-Halal meat, Halal meat, or vegetables, which are Halal.  No further evidence was presented regarding the enzymes contained in the cheese.  Thus, the partial wrapper does not establish by a preponderance of the evidence that the cheese served by the**

10

**Defendants was not Halal; rather, it only establishes that the cheese contained enzymes, the origin of which remains undetermined. Mr. Vega also offered the testimony of an inmate commissary server who testified that all inmates were served the same cheese. However absent evidence that the cheese was not Halal, this does not constitute a violation of Vega's right of religious expression or practice because he offered no evidence that serving Halal cheese to non-Muslims violated his religious beliefs or impeded his religious observance. Furthermore, although Mr. Vega's complaint contains an allegation that the Defendants retaliated against him due to his religious beliefs in relation to the serving of non-Halal cheese, Mr. Vega presented no evidence whatsoever as to retaliation at trial as to any Defendant in relation to cheese. There was thus no legally sufficient evidentiary basis for a reasonable jury to find for Mr. Vega on the issue of cheese.**

**Mr. Vega similarly failed to present sufficient evidence that the condition of the prayer rugs substantially burdened the exercise of his religious beliefs such that a reasonable jury would have a legally sufficient evidentiary basis to find for him on count 21. Mr. Vega introduced no evidence that any of the Defendants was responsible for the condition of the prison prayer rugs. Rather, the only evidence introduced at trial was that Mr. Vega made a complaint to Chaplain Imam Avci, who is not a defendant in this action. Imam Avci took Mr. Vega's complaint to his superior, Defendant Rene Kieda, who assigned the duty of cleaning the rugs to Imam Avci and gave him supplies with which to clean the rugs and Muslim inmate staff to clean them. Imam Avci specifically testified that**

11

on the occasion of Vega's complaint, the rug was dusty, but that the rug was never filthy or unsuitable for prayer. He further testified that vacuuming the rug rid it of dust and took care of any problem that existed. He testified that he supervised the cleaning of the rugs after Vega lodged his singular complaint. Mr. Vega did not sue Imam Avci, the party responsible for cleaning the rugs, nor did he complain about the rug after Rene Kieda made Imam Avci responsible for cleaning them. Vega did attempt to impeach Imam Avci's testimony in contradiction of his claims by offering the testimony of another inmate who testified that the rug was "filthy," but he did not state when it was filthy. Mr. Vega has both failed to bring suit against the party responsible for the condition of the prayer rugs, and has failed to elicit evidence that the rugs' conditions substantially burdened the exercise of his religion.

No evidence was presented at trial to support Mr. Vega's allegation in count four that his religious freedom pursuant to the First Amendment, RLUIPA, or Connecticut constitutional or statutory law was infringed by the denial of his requests to purchase a digital Quran or Islamic educational compact discs, nor was any evidence presented that these denials constituted a violation of Mr. Vega's right to equal protection under the Fourteenth Amendment.[1] Although Mr. Vega testified that he needed a digital Quran because he was confined in a cell

---

[1] To prove an equal protection violation, a plaintiff "must demonstrate that he was treated differently than others similarly situated as a result of the intentional or purposeful discrimination." *Phillips v. Girdich*, 408 F.3d 124, 129 (2d Cir. 2005). "He also must show that the disparity in treatment cannot survive the appropriate level of scrutiny which, in the prison setting, means that he must demonstrate that his treatment was not 'reasonably related to [any] legitimate penological interests.' " *Id.* (quoting *Shaw v. Murphy*, 532 U.S. 223, 229 (2001)).

measuring six feet by six feet, he offered no testimony that he did not have room for his religious reading material or that he did not have access to a traditional Quran.  He also admitted that he had been given permission to purchase and has in his possession many Islamic cassette tapes, including some relating to the Quran.  In addition, Vega's direct testimony that he was denied recordings of the Quran was impeached by evidence that Department of Corrections policy forbade all inmates from having digital electronic equipment for security reasons, although the policy was under review.  Further. Mr. Vega testified that he did not know of any other inmate who had a digital electronic device.  No reasonable jury could find that Vega was denied his right of religious freedom by having to read the Quran or other Islamic educational materials in a traditional format or listen to it on a cassette recorder rather than a digital compact disk player.

      Likewise, no legally sufficient evidentiary basis was presented at trial such that a reasonable jury could find that Mr. Vega's religious rights were infringed by the denial of his request to buy Islamic educational compact discs (CDs). Although Vega testified that cassettes were being phased out at the time he complained about his inability to purchase compact discs, he introduced no evidence that the material he sought to purchase on CDs was not available on cassette tapes.  In fact, just days before he grieved his inability to purchase CDs, Vega admitted that he was given permission to purchase ten Islamic cassette tapes.  In addition, as noted above, Department of Corrections policy forbade inmates from having CDs at the time of Vega's request.  Vega admitted that he was notified that this policy was under reconsideration.  Finally, Vega offered no

13

direct or circumstantial evidence from which a jury could conclude that any other particular inmate was allowed to have religious or any other CDs at the time of his request, in violation of the Fourteenth Amendment.

### Eighth Amendment Claims

Mr. Vega also alleged violations of the Eighth Amendment in relation to counts 4, 14, and 21.  The Eighth Amendment to the United States Constitution prohibits the infliction of "cruel and unusual punishments."  U.S. Const. Amend. VIII; *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013).  The Eighth Amendment imposes on prison officials a duty to provide humane conditions of confinement and to "take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994).  To make out a violation of the Eighth Amendment, a plaintiff must demonstrate first that the injury suffered was "sufficiently serious," and second, that the responsible officials must have acted with "deliberate indifference to inmate health or safety."  *Id.* at 834 (citations omitted); *Wassmann v. Cnty. of Ulster, N.Y.*, 528 F. App'x 105, 106 (2d Cir. 2013) (same).

Mr. Vega presented no evidence at trial to corroborate either prong of the Eighth Amendment analysis: no evidence on the record demonstrates that any Defendant acted with deliberate indifference to inmate health or safety, and indeed no evidence demonstrates that Mr. Vega's claims as to the denial of the digital Quran or CDs, the non-Halal Jolly Ranchers, or the prayer rugs even reasonably relates to inmate health or safety.  As such, there is no legally

14

sufficient evidentiary basis for a reasonable jury to find in favor of Mr. Vega on his Eighth Amendment claims.

### Dismissal of Defendants

Finally, the Plaintiff failed to offer any evidence regarding the acts or omissions of numerous Defendants as to whom the Court entered dismissals, including Rene Kieda, Michael Beaudry, Andrew Johnson, Lieutenant Allen, Maureen Allen, Officer Arzt, Officer Sharon, and Neil Cormier.

### Conclusion

For the foregoing reasons, the Court entered judgment as a matter of law pursuant to Rule 50 in favor of all Defendants.

IT WAS SO ORDERED.

_____/s/_____
Hon. Vanessa L. Bryant
United States District Judge

Dated at Hartford, Connecticut: March 24, 2014